## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **EMMANUEL C. GONZALEZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Case No. 2:14-cv-0906** |
| **vs.** | § | **Consolidated Lead Case** |
| | § | |
| **INFOSTREAM GROUP, INC.,** | § | **JURY DEMAND** |
| | § | |
| **Defendant.** | § | |
| **NEW LIFE VENTURES, INC.** | § | **Case No. 2:14-cv-0907** |
| **TAGGED, INC.** | § | **Case No. 2:14-cv-0993** |

## EXPERT REPORT OF DANIEL MANHEIM REGARDING INVALIDITY
## OF U.S. PATENT NOS. 7,558,807 AND 7,873,665

# TABLE OF CONTENTS

I.     Background & Qualifications ........................................................................... 1

II.    Materials Reviewed ......................................................................................... 3

III.   Legal Standards Applied In This Report ......................................................... 4

    A.    Presumption of Validity / Clear and Convincing Evidence .................... 4

    B.    Prior Art ................................................................................................. 5

    C.    Level of Ordinary Skill .......................................................................... 5

    D.    Anticipation ........................................................................................... 6

    E.    Obviousness ........................................................................................... 7

    F.    Enablement ............................................................................................. 9

    G.    Written Description ............................................................................... 10

    H.    Patentable Subject Matter .................................................................... 10

    I.    Claim Construction .............................................................................. 12

IV.    The '807 and '665 Patents ............................................................................ 12

    A.    Priority Date ("The Time The Invention Was Made") .......................... 12

    B.    The Field Of The Invention And The Level Of Ordinary Skill In The Art ......... 13

    C.    Claim Construction .............................................................................. 14

    D.    Asserted Claims ................................................................................... 14

V.     Opinions Regarding The Invalidity Of The '807 and '665 patents ............... 17

    A.    eBay Anticipated And/Or Rendered Obvious The Asserted Claims ..... 17

        1.    eBay Used Digital Labels Such As Category, Price, Region, Ending Date, And Title ............................................................... 18

        2.    eBay Enabled Search Using Digital Labels Such As Category, Price, Region, Ending Date, And Title .................................... 21

        3.    The Asserted Claims Are Anticipated And Rendered Obvious By eBay .................................................................................... 23

    B.    HTML Meta-Tags Anticipated And/Or Rendered Obvious The Asserted Claims ................................................................................................... 41

        1.    HTML Meta-Tags Are "Digital Labels" .................................... 41

        2.    Search Engines Enabled Search Of HMTL Meta-Tags ............. 47

        3.    The Asserted Claims Are Anticipated And/Or Rendered Obvious By HTML Meta-Tags ...................................................... 49

C.     Library Card Catalogs Rendered Obvious The Asserted Claims ....................... 60

1.     Library Card Catalogs Use Labels Such As Author, Title, Subject, And Library of Congress Classification ................................................ 61

2.     Library Card Catalogs Enabled Search Using Labels Such As Author, Title, Subject, And Library of Congress Classification............. 62

D.     Mr. Gonzalez Made Factually Incorrect Statements To The Patent Office During Prosecution Of The '807 And '665 Patents............................................ 75

E.     Unpatentable Subject Matter.................................................................................. 79

1.     The asserted claims are directed to an abstract concept of using labels on the internet ................................................................................ 79

2.     Mr. Gonzalez's Lack Of Technical Knowledge Supports The Conclusion That His Alleged Invention Was An Abstract Idea, Not A Technological Innovation ................................................................... 85

VI.    Use Of Demonstratives .................................................................................................... 86

# I.  BACKGROUND & QUALIFICATIONS

1.      I have been retained by Greenberg Traurig, LLP on behalf of New Life Ventures Inc. ("New Life") and Tagged Inc., which is now known as If(we) Inc. ("Tagged"), to provide assistance and expert testimony regarding U.S. Patent Nos. 7,558,807 ("the '807 Patent") and 7,873,665 ("the '665 Patent").

2.      My *curriculum vitae* describing my background and experience is attached hereto as Exhibit 1.

3.      I have fifteen years of experience in the software development industry and six years of experience specifically analyzing software for patent infringement.  For the past fifteen years, I have worked as a software developer and a manager of teams building complex software projects.  I have developed complex software for companies like General Motors, Honda, Disney, Nestle and Red Lion hotels.  I have hired and managed teams of software engineers working on large software projects.  I am familiar with more than fifteen programming languages and software technologies.  I have consulted on, designed, and built numerous database driven applications storing and indexing large amounts of data and providing search capability to end users. I architected the database structure, including database schema and indexes, to optimize for fast, efficient searching. I configured and deployed the applications to run on the Windows and Linux operating systems.  For example, I worked with my team at Threshold Interactive to design and build the Honda powersports web site, http://powersports.honda.com which receives millions of views per month. The Honda powersports site loads all displayed content from a Relational Database Management System and includes a search feature throughout the site allowing users to find information related to Honda powersports vehicles, such as motorcycles, and related articles.  Additionally, I engineered a

content crawler and indexer to generate a keyword index to support keyword based search on a web site.

4.      For the past six years, I have owned my own consulting business, Manheim Consulting, Inc. I specialize in analyzing patent infringement, validity, and software source code. In my business, I have analyzed hundreds of patents and I have spent thousands of hours inspecting complex software developed by industry leading companies like Google, Apple, IBM, and Microsoft . I have worked on dozens of major patent infringement cases that have been litigated in courts all over the country. I have worked on many cases that have been litigated in the Eastern District of Texas.  I have spent thousands of hours analyzing source code and comparing it to patent claims relating to software.

5.      I received my Bachelor's degree in computer science from UCLA and my MBA from the University of Southern California Marshall School of Business.  I have taken numerous courses on computer operating systems, data structures, and methods for data storage, organization, and retrieval. I have also taken courses on managing the design, development, and deployment of large, complex software projects.  As part of my coursework, I built modifications to core aspects of an operating system as well as a simple indexed database.

6.      During the previous four years, I have not testified as an expert at trial or by deposition in any cases.

7.      In this report, I have been asked to address the issue of invalidity.  My analysis in this report relates only to claims 1, 2, and 3 of the '807 patent, and claims 1, 42, and 53 of the '665 patent (collectively, the "asserted claims").

8.      I have been informed that this matter is pending in the Eastern District of Texas, Civil Action Nos. 2:14-cv-906 (consolidated lead case), 2:14-cv-907 (New Life case) and 2:14-

cv-993 (Tagged case), that the parties in this matter are Plaintiff Emmanuel C. Gonzalez ( "Gonzalez" or "Plaintiff") and Defendants Tagged and New Life.

9.      I have been informed that in this matter, Gonzalez asserts that each of Tagged and New Life infringes the '807 and '665 patents, and that Tagged and New Life each denies infringement and asserts that the '807 and '665 patents are invalid.

10.     My work on this case is billed at the rate of $400 per hour.  My fee is not contingent on or in any way related to the outcome of any matter or to any of my opinions.

11.     I have no financial interest in the outcome of this case, in any of the parties of this case, or in any party that is related to the parties in this case.  Specifically, I have no financial interest in: (i) Tagged or any entity related to Tagged; (ii) New Life or any entity related to New Life; (iii) Emmanuel C. Gonzalez or any entity related to him.  I have not to my recollection have ever had any contact with the listed inventor of the '807 and '665 patents: Emmanuel C. Gonzalez.

## II.   <u>MATERIALS REVIEWED</u>

12.     In preparing my opinions, I have reviewed and relied upon the following documents:

- The '807 and '665 patents;

- The file history of the '807 and '665 patents, including:

    o   U.S. Provisional Patent Application No. 60/238,303 (filed Oct. 4, 2000),

    o   the file history of U.S. Patent Application No. 09/791,440 (filed Feb. 22, 2001)

    o   the file history of U.S. Patent Application No. 10/849,075 (filed May 18, 2004)

    o   the file history of U.S. Patent Application No. 12/624,350 (filed Nov. 23, 2009)

- The Court's MEMORANDUM OPINION AND ORDER regarding claim construction (Dkt. No. 109);

- The HTML 4.01 Specification, published December 24, 1999;[1]

- Exhibits eBay1 through eBay9 (attached hereto), all of which are copies of pages on eBay.com from the 1999-2000 timeframe that were archived by Archive.org and retrieved using the Wayback Machine;[2]

- All other documents cited in this report.

## III.   <u>LEGAL STANDARDS APPLIED IN THIS REPORT</u>

13.     I am not an attorney and will not offer opinions on the law.  I have, however, been informed by counsel that the following legal principles apply to the subject matter of this expert report, and I have used those principles in arriving at my opinions as stated in this report.

### A.     **Presumption of Validity / Clear and Convincing Evidence**

14.     I understand that an issued United States patent is presumed valid.  I have written my Report with the understanding that a party challenging the validity of an issued United States patent bears the burden of proving invalidity by clear and convincing evidence.  I understand that "clear and convincing" evidence is evidence that shows something is highly probable.  I understand that clear and convincing evidence requires more than "a preponderance of the evidence" but less than "beyond a reasonable doubt."  I have used the "clear and convincing" evidence standard throughout this report.

15.     Further, I understand that each patent claim is considered separately for purposes of invalidity.

---

[1] Available at http://www.w3.org/TR/html4/html40.zip and http://www.w3.org/TR/html4/.
[2] https://archive.org/web/

B.     **Prior Art**

16.     I understand that "prior art" includes any of the following items:

- any product or method that was publicly known or used by others in the United States before the date of invention;

- patents that issued more than one year before the filing date of the patent, or before the date of invention;

- publications having a date more than one year before the filing date of the patent, or before the date of invention;

- any product or method that was in public use or on sale in the United States more than one year before the patent was filed; and

- any product or method that was made by anyone before the named inventors created the patented product or method where the product or method was not abandoned, suppressed, or concealed.

17.     I understand that a prior art "reference" is any single one of the above, *e.g.* a patent, a publication, or a product.

C.     **Level of Ordinary Skill**

18.     I understand that a patent is to be understood from the perspective of a hypothetical "person of ordinary skill in the art" to which the patent pertains.  I understand that in considering what the claims of a patent require, what was known prior to that patent, and what a prior art references discloses, one must use the perspective of a person of ordinary skill in the art.  I have been instructed to consider all the issues addressed in this report from the perspective of a person of ordinary skill in the art.

19.     I understand that I am to consider a number of factors in analyzing the level of ordinary skill:

- Education of the inventor;

- The type of problems encountered in the art;

- Prior art solutions to those problems;

- Rapidity with which innovations are made;

- Sophistication of the technology; and

- Education level of workers in the relevant field.

20.     I also understand that a person of ordinary skill in the art is not an automaton and possesses an ordinary amount of creativity.

### D.     Anticipation

21.     I understand that a patent claim is invalid if the claimed invention is not new.  It is my understanding that claims of a patent are invalid as "anticipated" by a prior art reference if a person of ordinary skill in the art would have understood at the relevant time that each and every element of the claim is disclosed in a single prior art reference (*e.g.* a single patent or publication), and that those elements are arranged or combined in the same way as in the claim, so that a person of ordinary skill in the field of the invention, looking at that single prior art reference, would be able to make and use at least one embodiment of the claimed invention.

22.     I understand that a reference may also disclose a limitation "inherently," if that limitation is necessarily present in the reference.

23.     Consistent with what I noted above regarding the burden of proof, I have written this Report with the understanding that anticipation must be shown by clear and convincing evidence.

### E.    Obviousness

24.    I further understand that claims of a patent are invalid as "obvious" if, at the time claimed invention was made, the differences between the invention and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art to which the subject matter pertains.

25.    I understand that for the asserted claims of the'823 patent, the relevant timeframe (*i.e.* "the time the invention was made") is approximately September, 1995.

26.    I understand that a determination of whether a claim is obvious should be based on consideration of the following factors: (1) the level of ordinary skill in the art that someone would have had at the time the claimed invention was made; (2) the scope and content of the prior art; (3) the differences, if any, that existed between the claimed invention and the prior art; and (4) of non-obviousness, if any.

27.    I understand that "secondary considerations" of non-obviousness are also sometimes referred to as "objective indicia" of non-obviousness, and that they include the following:

- whether the claimed invention was commercially successful as a result of the merits of the claimed inventions (rather than the result of design needs or market pressure, advertising, or similar activities);

- whether the claimed invention satisfied a long-felt need;

- whether others had tried and failed to make the claimed invention;

- whether others copied the claimed invention;

- whether the claimed invention achieved unexpected results;

- whether others in the field praised the claimed invention;

- whether others in the field expressed surprise or disbelief regarding the claimed invention;

- whether others sought or obtained rights to the patent from the patent-holder;

- whether the inventor proceeded contrary to accepted wisdom in the field; and

- whether others independently invented the claimed invention before or at about the same time as the named inventor thought of it (this factor suggests obviousness, not non-obviousness).

28.     I understand that the existence of each and every element of the claimed invention in the prior art does not by itself show obviousness because most, if not all, true inventions rely on building blocks from prior art.  I understand that if the prior art as whole teaches away from combining elements in the manner required by a patent claim, that suggests the claim is not obvious.

29.     I also understand that it is important to be careful not to determine obviousness using hindsight because many true inventions can seem obvious after the fact.  Obviousness must be considered from the perspective of a person of ordinary skill in the art at the time the claimed invention was made, and it is improper to consider what is known today or what is learned from the teaching of the patent.  Thus, it is improper to use the patent as a "road map" for selecting and combining prior art.

30.     I understand that a claim can be found invalid as obvious if it is the result of, for example:

- Combining prior art elements according to known methods to yield predictable results;

- Simply substituting one known element for another to yield predictable results;

- Using a known technique that improves similar devices, methods, or products in the same way;

- Applying a known technique to a known device, method, or product ready for improvement to yield predictable results;

- Choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success (i.e., "obvious to try");

- Known work in one field of endeavor that may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art.

31.    I further understand that a claim can be obvious if the elements of the claim that are not found in a reference or combination of references can be supplied by the "common sense" of one of skill in the art.

32.    I have prepared this report with the understanding that obviousness must be shown by clear and convincing evidence.

**F.    Enablement**

33.    I further have been advised that a claimed invention must be enabled.  In order to meet this enablement requirement, the description in the patent must be sufficiently full and clear to have allowed persons of ordinary skill in the art to make and use the claimed invention without undue experimentation, at the time the patent application was originally filed.

34.    Factors that may be relevant to consider in determining whether making the invention would require undue experimentation include:

- The quantity of experimentation necessary;

- The amount of direction or guidance disclosed in the patent;

- The presence or absence of working examples in the patent;

- The nature of the invention;

- The state of the prior art;

- The relative skill of those in the art;

- The predictability of the art; and

- The breadth of the claims.

35.     I understand that invalidity for lack of enablement   (failure to meet the enablement requirement) must be shown by clear and convincing evidence.

### G.     Written Description

36.     It is my understanding that a patent must contain a written description of the claimed invention.  In order to meet this written description requirement, the description of the invention in the specification portion of the patent must be detailed enough to demonstrate to a person of ordinary skill in the art that the applicant actually possessed the invention as claimed in the claims of the issued patent.

37.     I understand that invalidity for inadequate written description (failure to meet the written description requirement) must be shown by clear and convincing evidence.

### H.     Patentable Subject Matter

38.     I am informed that a claim may not be directed to patent-eligible subject matter under circumstances.  In particular, I understand that a claim is not patent-eligible if the claim is directed to a law of nature, natural phenomenon, or abstract idea, and the claim does not recite additional elements that amount to significantly more than a law of nature, natural phenomenon, or abstract idea.

39.     I am further informed that fundamental economic practices, an idea "of itself," certain methods of organizing human activity, and mathematical relationships/formulas may constitute abstract ideas.  Unpatentable abstract ideas, I understand, have included non-limiting examples like:

- Comparing information regarding a sample or test subject to a control or target data;

- Collecting and comparing known information;

- Comparing data to determine a risk level;

- Comparing new and stored information and using rules to identify options;

- Using categories to organize, store, and transmit information;

- Data recognition and storage;

- Organizing information through mathematical correlations;

- An algorithm for converting binary coded decimal to pure binary;

- A formula for computing an alarm limit;

- A formula describing certain electromagnetic standing wave phenomena;

- Reducing the amount of calculations in known and established computations;

- An algorithm for calculating parameters indicating an abnormal condition;

- Calculating the difference between local and average data values;

- Performing repetitive calculations;

- Receiving, processing, and storing data;

- Electronically scanning or extracting data from a physical document;

- Electronic recordkeeping;

- Automating mental tasks; and

- Receiving or transmitting data over a network, e.g., using the Internet to gather data.

40.    As I stated above regarding the presumption of validity, I have prepared this report with the understanding that non-patentable subject matter must be shown by clear and convincing evidence.

## I.    Claim Construction

41.    I am informed that the proper interpretation of claims begins with the ordinary meaning of the terms of the claim.  I understand that there is a presumption that the terms in a claim carry their plain meaning to a person of ordinary skill, and I further understand that the most important sources for determining the meaning of the claim term are the claims themselves, the specification, and the prosecution history of the patent – the so-called intrinsic evidence.  I am also aware that the meaning of a claim term can be supported or confirmed by extrinsic evidence, such as dictionaries, treatises, and inventor testimony.  I also understand that an inventor may act as his own lexicographer and define a claim term in either the specification or prosecution history in a way that differs from the term's ordinary meaning.  I am informed that the meaning of a claim term may also be modified if the patentee clearly and unequivocally disavowed the full scope of the claim term in either the specification or the prosecution history.

## IV.    THE '807 AND '665 PATENTS

### A.    Priority Date ("The Time The Invention Was Made")

42.    The '807 and '665 patents claim priority to a U.S. Provisional Patent Application (No. 60/238,303) filed on October 4, 2000.

43.    I understand that the two letters and draft patent application (GONZ-01518, GONZ-01519, and GONZ-01520-1559) are the earliest evidence of Mr. Gonzalez's invention. The earliest-dated letter is dated August 5, 2000.

44.    For purposes of this report, I have been instructed to use <u>July 1, 2000</u> as the "time the invention was made."  I have done so even though I understand that the earliest date of invention for which there is any possible evidence of corroboration is August 5, 2000.

**B.    The Field Of The Invention And The Level Of Ordinary Skill In The Art**

45.    The "Field of the Invention" of the '807 and '665 patents is data-gathering and labeling methods, and the use of those labels to facilitate searches, particularly in the context of data-gathering, labeling, and searching of websites:

> The present inventions relate to data-gathering and digital labeling methods for Websites, and the structure and operating processes of a specialized Host Website whose function is to maintain a library of website digital labels and to use these labels to assist in Internet searches.

> *'807 Patent at 1:12-20.*

46.    I am familiar with the technical field of the '807 and '665 patents, and I was familiar with it in the July 1, 2000 timeframe (*i.e.* "the time the invention was made").

47.    I believe the level of ordinary skill relevant to the '807 and '665 patents would be an individual with an undergraduate degree in computer science, or an equivalent combination of education and experience.  My opinion about the level of "ordinary skill" is based on my review of the '807 and '665 patents and my own familiarity with both the developments that were occurring in the technical field of the '807 and '665 patents in the July 1, 2000 timeframe, and with the level of education and experience of the practitioners in the field at the time.

48.    I understand that for the asserted claims of the '807 and '665 patents, the knowledge of a person of ordinary skill in this field is to be considered as of the July 1, 2000 timeframe (*i.e.* "the time the invention was made").

13

## C.    Claim Construction

49.    I understand that a claim construction ruling has been issued by Magistrate Judge Payne.  I have reviewed the claim construction order. *MEMORANDUM OPINION AND ORDER, Dkt. No. 109*.  I have repeated below the claim constructions that apply to the asserted claims:

| **Claim Term** | **Construction** |
|---|---|
| "digital label"<br>*all claims* | "something symbolic of unambiguous qualitative data about an item, its maker, or its owner, in digital form." |
| "uniquely refers to"<br>*'665 Patent Claim 1* | plain and ordinary meaning |
| "search . . . for subscriber digital labels"<br>*'807 Patent Claim 1* | plain and ordinary meaning |
| "search . . . based on the labels"<br>*'807 Patent Claim 3* | plain and ordinary meaning |
| "effective use of these multi-parameter digital labels"<br>*'665 Patent Claim 1* | plain and ordinary meaning |

## D.    Asserted Claims

50.    The asserted claims are claims 1, 2, and 3 of the '807 patent, and claims 1, 19, 42, and 53 of the '665 patent.

51.    Claim 1 of the '807 patent is an independent claim, and claim 2 depends from it. Claims 1 and 2 of the '807 patent read as follows:

> *[807-1a]* 1. A <u>host website apparatus</u> for listing subscribers comprising: a computer system,

*[807-1b]* said computer system includes a <u>digital label database</u> for providing to a listing subscriber

> *[807-1c]* <u>digital labels</u> representing different specific qualities

> *[807-1d]* and a <u>subscriber database</u> for storing a listing of subscribers' digital labels;

*[807-1e]* said computer system being configured to respond to a subscriber's request for listing and <u>guiding the subscriber via the Host Website display to enter information pertaining to the subscriber</u> and

*[807-1f]* converting the information to digital labels

> *[807-1g]* by accessing said digital label database and storing the subscriber's digital labels in said subscriber database; and

*[807-1h]* said computer system further configured to enable users to <u>search</u> said subscriber database <u>for subscriber digital labels</u> identifying subscriber qualities.

*[807-2]* 2. A website as in claim 1 in which the website is configured for a specific subject.

52.      Claim 3 of the '807 patent is an independent claim.  Claim 3 of the '807 patent reads as follows:

[807-3a] 3. A method for listing websites on the Internet comprising the steps of: configuring a computer system

[807-3b] to compile a digital label database for providing to a listing subscriber

> [807-3c] digital labels representing different specific qualities

> [807-3d] and to compile a subscriber database for storing a listing of subscribers' digital labels;

[807-3e] configuring said computer system to respond to a subscriber's request for listing; guiding the subscriber via a website display to enter information pertaining to the subscriber; and

[807-3f] converting the information to digital labels

[807-3g] by accessing said digital label database and storing subscriber digital labels in Host Website databases.

53.     Claim 1 of the '665 patent is an independent claim, and claims 42, and 53 depend from claim 1.  Claims 1, 42, and 53 of the '665 patent read as follows:

*[665-1a]* 1. A method for multi-parameter digital labelling of Internet Websites, comprising:

*[665-1b]* gathering of unambiguous, multi-parameter qualitative data

> *[665-1c]* concerning a single or a plurality of at least one of an Internet website, an Internet posting, their substantive contents, and their owner or creator;

*[665-1d]* sourcing, from the owner or creator of said website or Internet posting, each said item of qualitative data referring to said website, said internet posting, or its substantive contents or its owner or creator;

*[665-1e]* producing a plurality of digital labels for each said website or internet posting, wherein each digital label uniquely refers to and represents a particular item of qualitative information;

*[665-1f]* wherein producing of digital labels further comprises encoding of the qualitative data in any digital form;

*[665-1g]* domiciling of these multi-parameter digital labels on at least one of the same computer, the same computer network, and on several computers linked to each other;

*[665-1h]* manipulation of the said multi-parameter digital labels comprising generation of a list of at least one of websites and Internet postings that match parameters stipulated by an entity conducting a search and represented in the digital labels according to at least one of the presence of, the absence of, the numerical or other value contained in, the numerical or other value not contained in, any one, all, and any configuration of the labels that have reference to one or more websites or Internet postings; and

*[665-1i]* making available the effective use of these multi-parameter digital labels and the means for their manipulation, to the general public through the Internet.

*[665-42]* 42. The method of claim 1, wherein the creator of the website is the owner or administrator of the website, and is provided with access to edit or modify the website or the labels associated with the website.

*[665-53]* 53. The method of claim 1, wherein the information encoded in a single label refers to at least one of a warranty that applies to a product for sale, the material or materials of which a product is made, to the country or geographic area where the materials for a product emanated, the way in which a product is made, the country or geographic area that a product was made in, the age of a person or the year of his/her birth, the geographic area where a person resides such as a country, region, state, city, neighborhood and district, but is not a precise address, the geographic area where a person works such as country, region, state, city, and neighborhood or district, but is not a precise address, a person's ethnic origin or ethnicity, a person's cultural origin or background, a person's ancestry or the nationality or ethnicity of a person's parents and other forebears, a person's sex, a person's sexual orientation, to a personal preference of a person, a personal belief of a person, the income or wealth of a person, to the size of a business by reference to at least one of its sales, profits, and other financial indicators, the size of a business by reference to the number of outlets or branches it has, and the size of a business by reference to the number of employees it has.

## V.    OPINIONS REGARDING THE INVALIDITY OF THE '807 AND '665 PATENTS

### A.    eBay Anticipated And/Or Rendered Obvious The Asserted Claims

54.    eBay was a well-known website that provided online classified ads to the public prior to July 1, 2000.  The public use of eBay in the United States is "prior-art" to the '807 and '665 patents.  *See supra ¶ 13 (defining "prior art").*



***Ex. eBay-8*** *(eBay page archived Oct. 12, 1999)*

### 1.  eBay Used Digital Labels Such As Category, Price, Region, Ending Date, And Title

55.    Like the classified ads in newspapers, eBay required sellers to list their items in categories such as "antiques," "automotive," or "tickets."  (***Ex. eBay-8***).

56.    Like the classified ads in newspapers, eBay allowed sellers to set a minimum price for their items.  *See **Ex. eBay-4*** ("If you receive one or more bids above your minimum price, you are legally obligated to complete the transaction.")

57.    Like the classified ads in newspapers, eBay required sellers to include a title for their listing:

## Find Items

By Title - By Item Number - By Seller - By Bidder - Completed Search - International Search

| By Title<br>eBay's most popular<br>search feature | [_____] Search tips<br>☐ Search title and description |
|---|---|
| Category | All Categories ▼ |
| Price Range | Between $ [_____] And $ [_____] |
| Regions | All of eBay ▼  or  Search by country |
| Order by | Ending Date ▼  ◉ ascending ○ descending |
| View Results | ◉ All items<br>○ All items with Gallery preview **NEW!**<br>○ Gallery items only **NEW!**<br>☐ Text only results |
|  | Search completed auctions |

***Ex. eBay-5*** *(eBay page archived Oct. 12, 1999)*

58.　　Like the classified ads in newspapers, eBay required sellers to list their items in a geographic region.  (***Ex. eBay-5*** (eBay page archived Oct. 12, 1999)).

59.　　Like the classified ads in newspapers, which would run for a period of time, eBay required sellers to list their items with an auction ending-date. (*See* ***Ex. eBay-4*** ("Choose a 3-, 5-, 7-, or 10-day auction").

60.　　eBay stored the category, price, region, ending date, and title of each eBay listing in a relational database.  (***Ex. eBay-5*** *(eBay page archived Oct. 12, 1999)*).

61.　　The category, price, region, ending date, and title of a eBay listing are each "digital labels" as that term has been construed by the court because they are each "symbolic of unambiguous qualitative data," and are not mere character-strings of unknown significance.

62.　　I also note that the category, price, region, and ending date of an eBay listing is the same as the type of digital label that the '807 and '665 patents describe as "pure digital labels":

Multi-parameter digital labels could be used to indicate, for example: the nature of an entity or of its activities; location or service area; price range; specific products or services offered; credit and payment terms; exact facilities offered to customers; and many other forms of unambiguous qualitative information which could later be digitally manipulated to identify the entity under a variety of search circumstances. Information that is not even on a site could be encoded for the site. For instance, a corporation's site might not mention that it is a Fortune 500 company; but this fact could be labeled.

*'807 patent at 5:8-18.*

The multi-parameter digital labels thus far described are "pure" digital labels. For example, in the process of listing on the Host Website, an entity may indicate that it is a wine merchant, where "wine merchant" is a predefined term within the listing process, and this phrase is therefore "understood" by both the subscriber and the website computer.

*'807 patent at 6:22-27.*

63.     I also note that the title of an eBay listing is the same as the type of digital label that the '807 and '665 patents describe as "hybrid digital labels":

A hybrid digital label is one in which the field is unambiguously digitally defined as a certain kind of field, but the subscriber entry in the field is a character string.

For example, a Digital Labeling Website may invite subscriber wine merchants to enumerate the wines they stock, these enumerations to be recorded in a database field which it predefines as "wine merchant stock list." The subscriber may then enter text (character strings), e.g., "Chateau Latour 1961." This entry, despite being a character string, now has a known and unambiguous significance, which is that it represents a wine of some sort offered by a wine merchant. With an appropriate interface, a site visitor could type out a particular wine name, in response to which the Host Website computer would perform a word-match search which is limited to this certain database field ("wine merchant stock list").

*'807 patent at 6:32-46*

64.     The title of an eBay listing corresponds exactly to this description: a seller can input a character string into the Title field of the eBay listing form, and a buyer can type out a particular word into a title-search field, in response to which eBay would perform a word-match search which is limited to that particular database field ("Title"):



*Ex. eBay-5* (eBay page archived Oct. 12, 1999)

65.     This confirms my opinion that the category, price, region, ending date, and title of a eBay listing are each "digital labels" as that term has been construed by the court.

### 2.     eBay Enabled Search Using Digital Labels Such As Category, Price, Region, Ending Date, And Title

66.     Like the classified ads in newspapers, eBay allowed buyers to browse through listings based on regions and categories:

Manheim Invalidity Report – '807 Patent, '665 Patent



***Ex. eBay-8*** *(eBay page archived Oct. 12, 1999)*

67.     eBay also allowed buyers to search for listings based on category, price, region, ending-date, and title:

# Find Items

By Title - By Item Number - By Seller - By Bidder - Completed Search - International Search

| By Title | | |
|---|---|---|
| **By Title** eBay's most popular search feature | ☐ Search title **and** description | Search   tips |
| Category | All Categories ▾ | |
| Price Range | Between $ _____   And $ _____ | |
| Regions | All of eBay ▾   or   Search by country | |
| Order by | Ending Date ▾   ◉ ascending ◯ descending | |
| View Results | ◉ All items ◯ All items with Gallery preview NEW! ◯ Gallery items only NEW! ☐ Text only results | |
| | Search completed auctions | |

***Ex. eBay-5*** *(eBay page archived Oct. 12, 1999)*

### 3.     The Asserted Claims Are Anticipated And Rendered Obvious By eBay

**[807-1a] 1. A <u>host website apparatus</u> for listing subscribers comprising: a computer system,**

68.     In my opinion, a person of ordinary skill in the art would have recognized that eBay disclosed limitation [807-1a].

69.     eBay provided a website via which registered users were enabled to list items to be sold via an online auction.  For example, users could visit eBay.com, register, and list items for sale on the site:



**_Ex. eBay-6_** *(eBay page archived Oct. 12, 1999)*

70.     eBay users could list items for sale by following a few easy steps, including filling out a basic form, choosing a category and other options, then posting the item for sale:

**How to Sell**
It's fun and easy to sell your stuff on eBay! **Here's how:**

1. **Simply fill out the** form or click under Sell in the Navigation Bar on the eBay home page. Choose a 3-, 5-, 7- or 10-day auction. Click on Sell Your Item, and you're in business!

2. **Make your listing look great with** linked pictures or fancy text. A short, descriptive title and a complete description of your item will also help your sales. But be truthful in your listings. Disappointed buyers are likely to leave you negative feedback.

3. Price **to sell!** Consider setting the minimum bid for your item a little lower than you think it will eventually sell for, just to get the auction going. Don't set it lower than you're willing to sell for, though. Be sure to clarify additional terms or expenses like who pays for shipping and insurance.

**_Ex. eBay-4_** *(eBay page archived Oct. 12, 1999)*

71.        Thus eBay discloses limitation [807-1a] ("A host website apparatus for listing subscribers comprising: a computer system").

**_[807-1b]_ said computer system includes a _digital label database_ for providing to a listing subscriber**

72.        In my opinion, a person of ordinary skill in the art would have recognized that eBay disclosed limitation [807-1b].

73.        eBay's website enabled users to find items through a variety of search options.  A person of ordinary skill in the art would have understood that the search capabilities provided utilized a database.  (*See **_Ex. eBay-5_***).

74.        Users could search by title, category, price range, region, ending date, items with pictures-only, by item number, by seller, by bidder, and more.  (*See **_Ex. eBay-5_***).  Information about each data element was stored in a database, and users could manipulate forms, form elements, and links on eBay's website to search eBay's database.

75.        Thus eBay discloses limitation [807-1b] ("said computer system includes a digital label database for providing to a listing subscriber").

**[807-1c] digital labels representing different specific qualities**

76.    In my opinion, a person of ordinary skill in the art would have appreciated that eBay disclosed limitation [807-1c].

77.    eBay listings included labels for many specific qualities, including at least Title, Category, Price, Auction ending date, Item Number, Seller (user ID or email address), Bidder (user ID or email address), and Country.  (*See **Ex. eBay-5***).  These labels were stored within fields in the database tables—which is how they could be searched using a form such as the one shown in eBay-5.

78.    In order to list an item for auction on eBay's website, sellers filled out a form (or forms) to enter data associated with the specific qualities, and submitted the completed form(s) to eBay, which stored the data for the auction listing in its database.  .  (*See **Ex. eBay-4***).

79.    Thus eBay discloses limitation [807-1c] ("said computer system includes a digital label database for providing to a listing subscriber").

**[807-1d] and a subscriber database for storing a listing of subscribers' digital labels;**

80.    In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [807-1d].

81.    eBay allowed users to register with the site as subscribers and supported the ability for subscribers to post items to be auctioned on the site.

82.    eBay stored digital labels entered by the subscriber when listing an item, and associated with each auction item in a database, such that users could then search for and find items through the website's search forms.  (*See **Ex. eBay-5***).  A person of ordinary skill in the art would have understood that the data about each auction was stored in a database order to enable subsequent searches.

83.     Thus eBay discloses limitation [807-1d] ("and a subscriber database for storing a listing of subscribers' digital labels").

**[807-1e] said computer system being configured to respond to a subscriber's request for listing and <u>guiding the subscriber via the Host Website display to enter information pertaining to the subscriber</u> and**

84.     In my opinion, a person of ordinary skill in the art would have appreciated that eBay disclosed limitation [807-1e].

85.     eBay listings were created by a user who navigated through eBay's auction forms in order to create a listing.  A person of ordinary skill in the art would have understood that this required entering information about each auction.  (*See **Ex. eBay-4***).  A user would enter information into an HTML form (or forms) created by eBay, which including at least Title, Category, Price, Auction ending date, Item Number, Seller (user ID or email address), Bidder (user ID or email address), and Country.  (*See **Ex. eBay-5***).

86.     Thus eBay discloses limitation [807-1e] ("said computer system being configured to respond to a subscriber's request for listing and guiding the subscriber via the Host Website display to enter information pertaining to the subscriber").

**[807-1f] converting the information to digital labels; &**

**[807-1g] by accessing said digital label database and storing the subscriber's digital labels in said subscriber database; and**

87.     In my opinion, a person of ordinary skill in the art would have appreciated that eBay disclosed limitations [807-1f] & [807-1g].

88.     A person of ordinary skill in the art would have recognized that the information that was entered via form (see *§ [807-1e]*) would be converted and stored in a database.  For example, a user would have selected a category for a particular auction, like Automotive, Computers, or Photo & Electronics.  (*See **Ex. eBay-1** (eBay page archived Sept. 14, 1999)*).

This category would be selected via a drop-down form element, and the selection would be converted into a value that would be stored in a database, in such a manner that the category associated with a particular auction could then be used in subsequent searches.[3]  For example, when storing in the database, the category may be converted to a category identifier that would label the auction item as belonging to said category.  Further, storing a label in the database converts the label to a data type specified by the field in which it is stored such as for example, varchar, text, int, float, and date. A person of ordinary skill in the art would have considered this to be something symbolic of unambiguous qualitative data about an item, i.e. its category.

89.    *See also § [807-1h]*.  The fact that labels like Category and Region can be identified for search purposes using a drop-down menu confirms that these labels each uniquely refers to and represents a particular item of qualitative information, as claimed.  (*See __Ex. eBay-5__*)

90.    Other information input by a prospective seller on eBay's website like those discussed in *§ [807-1e]* would be stored in a similar manner.  For example, entries like Price would simply be stored as a number, and the auction's ending date would be stored in the form of a date element.  All of these would be considered digital labels in accordance with the Court's claim construction as understood by a person of ordinary skill in the art.

91.    Thus eBay disclosed limitation [807-1f] ("converting the information to digital labels") and [807-1g] ("by accessing said digital label database and storing the subscriber's digital labels in said subscriber database").

---

[3] *See also infra §§ [665-1e] & [665-1f]* (discussing HTML forms, HTTP POST requests, and conversion of data from a POST request into a database entry).

**[807-1h]** **said computer system further configured to enable users to <u>search</u> said subscriber database <u>for subscriber digital labels</u> identifying subscriber qualities.**

92.     In my opinion, a person of ordinary skill in the art would have appreciated that eBay disclosed limitations [807-1h].

93.     A person of ordinary skill in the art would have understood that users could search eBay's database using a variety of forms, and could search based on at least Title, Category, Price, Auction ending date, Item Number, Seller (user ID or email address), Bidder (user ID or email address), and Country.  (*See **Ex. eBay-5***).  A relational database such as the one used by eBay supported searching via the use of SQL (Structured Query Language) which allows searching by database fields, corresponding to labels, by specifying the fields in the SQL WHERE clause.

94.     eBay supported words and modifiers that enabled a user to search using a wide variety of search parameters and characteristics.  Some – but not all – of these advanced search capabilities are included below:

- **Not finding what you're looking for?**
  Don't despair—sometimes it just takes a couple tries. **Think of different words** to use.
  **Imagine yourself as the seller** of the item. What one or two key word(s) would you
  use to list it? Or try advanced search tips .

- **Be specific to narrow your search**
  Use specific words instead of general ones. For example, a search for "Beatles poster"
  will return fewer and more targeted listings than a search for "Beatles."

- **Using words such as *and, or, the***
  You can use these **if what you're searching for contains these words** (such as "Diana
  Ross and the Supremes" or "Truth or Dare"). Don't use *and, or, the* as Boolean
  operators or as words to link together separate items for a more complex search. See
  the chart below for the symbols that will work that way.

- **Use punctuation only when required**
  If it's not necessary, leave it out. For example, you'll be successful if you search for
  *Elvis t-shirt* (correct punctuation with hyphen) or *Elvis tee shirt* (correct wording
  *without* hyphen). **Try both searches if you want a complete listing of everything
  available.**
  But don't try *Elvis: t-shirt* (unnecessary colon) or *Elvis tee-shirt* (incorrect hyphen).

- **Expand your search by adding or deleting the letter "s"**
  Let's say you've found several listings by typing *diamond ring*. Find more of the same
  with very little overlap by entering *diamond rings*.

- **Search for exact phrases**
  Using quotation marks such as "Statue of Liberty" or "Gone With the Wind" will find
  items with **those exact words in sequence**. For example, without the quotation marks
  you may wind up with many other listings containing the words "statue" or "liberty."
  Special note: the following modifiers will not work with this type of search: (+), (-) or
  wild card (*).

- **Try plus (+) and minus signs (-) to broaden or narrow your search**
  If you enter **antique +lamp**, that tells the search engine to include the words antique
  and lamp. If you enter antique -lamp, that tells the search engine to include the word
  antique but not lamp. Don't forget—there's no space after the sign (e.g. +lamp, -teddy).
  Check the chart below for details.

- **Specify a date an item was made**
  For example, if you're looking for comic books from the 1950s, enter **comic books 195\*** The asterisk is a wildcard search and can be used in other ways. See the next tip below.

- **Use a wildcard for multiple endings**
  By typing an \* (asterisk symbol) at the end of a word, you can search for items with multiple endings. For example: Beatles man\* would return items such as Beatles manager, Beatles music mania, Beatles Nowhere Man, etc.

| If you type... | eBay will find items for sale that... |
|---|---|
| baseball autograph | include both of the words *baseball* and *autograph* |
| (baseball,autograph) (no spaces after comma) | include either the word *baseball* or *autograph* |
| "baseball autograph" | include the exact phrase *baseball autograph* |
| | |
| baseball -autograph | include the word *baseball* but **not** *autograph* |
| baseball +autograph | include the words *baseball* and *autograph* |
| star\* | are related to *Star Wars*, *stargazing*, *stars*, *Star Trek*, etc. |
| barbie -(ken,skipper) | include the word *barbie*, but **not** *ken* or *skipper* |
| "The Doors" | include the exact phrase *The Doors* |
| | |
| @0 baseball autograph | include either the word *baseball* or *autograph* |
| @1 gumball candy nuts | include at least two of the words of *gumball*, *candy*, and *nuts* |
| police k-9 | include both of the words *police* and *k-9* |
| candy M&M | include both of the words *candy* and *M&M* |
| coin $5 | include both of the words *coin* and *$5* |

*(See **Ex. eBay-2**)*

95.     A person of ordinary skill in the art would understand that these words and modifiers were converted into SQL queries to support searching the database according to the specified labels.

96.     Thus eBay disclosed limitation [807-1h] ("said computer system further configured to enable users to search said subscriber database for subscriber digital labels identifying subscriber qualities").

**[807-2] 2. A website as in claim 1 in which the website is configured for a specific subject.**

97.     In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [807-2].

98.     A person of ordinary skill in the art would have recognized that eBay categorized the available auctions with dozens of subjects, including antiques, books, computers, and more. (*See* **_Exs. eBay-1, eBay-6, eBay-7, eBay-8_**).   eBay also had sites dedicated to specific subjects like "automotive:"



(**_Ex. eBay-3_** (*eBay page archived Oct. 12, 1999*)).

99.     Thus eBay disclosed limitation [807-2] ("A website as in claim 1 in which the website is configured for a specific subject").

**[807-3a] 3. A method for listing websites on the Internet comprising the steps of: configuring a computer system.**

100.     In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [807-3a].

101.     *See § [807-1a]*.

102.     Thus eBay disclosed limitation [807-3a] ("A method for listing websites on the Internet comprising the steps of: configuring a computer system").

**[807-3b] to compile a digital label database for providing to a listing subscriber**

103.     In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [807-3b].

104.     *See § [807-1b]*.

105.     Thus eBay disclosed limitation [807-3b] ("to compile a digital label database for providing to a listing subscriber").

**[807-3c] digital labels representing different specific qualities**

106.     In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [807-3c].

107.     *See § [807-1c]*.

108.     Thus eBay disclosed limitation [807-3c] ("digital labels representing different specific qualities").

**[807-3d] and to compile a subscriber database for storing a listing of subscribers' digital labels;**

109.     In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [807-3d].

110.   *See § [807-1d].*

111.   Thus eBay disclosed limitation [807-3d] ("to compile a subscriber database for storing a listing of subscribers' digital labels").

**[807-3e] configuring said computer system to respond to a subscriber's request for listing; guiding the subscriber via a website display to enter information pertaining to the subscriber; and**

112.   In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [807-3e].

113.   *See § [807-1e].*

114.   Thus eBay disclosed limitation [807-3e] ("configuring said computer system to respond to a subscriber's request for listing; guiding the subscriber via a website display to enter information pertaining to the subscriber").

**[807-3f] converting the information to digital labels; &**

**[807-3g] by accessing said digital label database and storing subscriber digital labels in Host Website databases**

115.   In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitations [807-3f] and [807-3g].

116.   *See §§ [807-1f], [807-1g], & [807-1h].*

117.   Thus eBay disclosed limitations [807-3f] ("converting the information to digital labels") and [807-3g] ("by accessing said digital label database and storing subscriber digital labels in Host Website databases").

**[665-1a] 1. A method for multi-parameter digital labelling of Internet Websites, comprising:**

118.   In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [665-1a].

119.   *See §§ [807-1b] & [807-1c].*

120.     Thus eBay disclosed limitations [665-1a] ("A method for multi-parameter digital labelling of Internet Websites, comprising").

**[665-1b] gathering of unambiguous, multi-parameter qualitative data**

121.     In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [665-1b].

122.     *See § [807-1e]*.

123.     Thus eBay disclosed limitations [665-1b] ("gathering of unambiguous, multi-parameter qualitative data").

**[665-1c] concerning a single or a plurality of at least one of an Internet website, an Internet posting, their substantive contents, and their owner or creator;**

124.     In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [665-1c].

125.     *See § [807-1e]*.  In particular, the information that a would-be seller would enter via form to post an item for sale concerned an Internet posting / Internet website (e.g. an item available for sale via auction), its contents (e.g. title, category, price range), and the owner/creator (e.g. seller ID, seller email).  (*See **Ex. eBay-5***).

126.     Thus eBay disclosed limitations [665-1c] ("concerning a single or a plurality of at least one of an Internet website, an Internet posting, their substantive contents, and their owner or creator").

**[665-1d] sourcing, from the owner or creator of said website or Internet posting, each said item of qualitative data referring to said website, said internet posting, or its substantive contents or its owner or creator;**

127.     In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [665-1d].

128.     In order to list an item for auction on eBay's website, sellers themselves would fill out a form to enter information including labels about the item, referring to information referenced in *§ [807-1e]*.  (*See **Ex. eBay-4***).

129.     Thus eBay disclosed limitations [665-1d] ("sourcing, from the owner or creator of said website or Internet posting, each said item of qualitative data referring to said website, said internet posting, or its substantive contents or its owner or creator").

***[665-1e]*** **producing a plurality of digital labels for each said website or internet posting, wherein each digital label uniquely refers to and represents a particular item of qualitative information;**

130.     In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [665-1e].

131.     eBay listings were created by a user who navigated through eBay's auction forms in order to create a listing.  A person of ordinary skill in the art would have understood that this required entering information about each auction.  (*See **Ex. eBay-4***).  A user would enter information into an HTML form (or forms) created by eBay, which including at least Title, Category, Price, Auction ending date, Item Number, Seller (user ID or email address), Bidder (user ID or email address), and Country.  (*See **Ex. eBay-5***).

132.     When a user fills out an HTML form (such as the one shown in ***eBay-5***) and submits it, an HTTP "POST" request is submitted to the HTTP server that contains data corresponding to the information input into the HTML form by the user.  When eBay generated the HTML form(s) to allow users to list items for sale, eBay generated both the options displayed to the user by the HTML form (*e.g.* the text options in a drop-down menu), and also designated corresponding data values that would be included in the HTTP "POST" request (*e.g.* the choices

in a 10-item drop-down menu could be assigned to the numbers 0-9.)[4]   In so doing, eBay produced a plurality of digital labels for the auction listing, each of which uniquely refers to and represents a particular item of qualitative information about the listing, *e.g.* Title, Category, Region, Price, and Auction ending date, as claimed.

133.   *See also § [807-1h].*   The fact that labels like Category and Region can be identified for search purposes using a drop-down menu confirms that these labels each uniquely refers to and represents a particular item of qualitative information, as claimed.  (*See **Ex. eBay-5***)

134.   Thus eBay disclosed limitations [665-1e] ("producing a plurality of digital labels for each said website or internet posting, wherein each digital label uniquely refers to and represents a particular item of qualitative information").

**[665-1f] wherein producing of digital labels further comprises encoding of the qualitative data in any digital form;**

135.   In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [665-1f].

136.   As described above, when a user filled out an HTML form (or forms) to list an item for sale on eBay, and pressed "submit," eBay received data from the form through the HTTP "POST" request.  eBay then used that data to generate a database entry for the listing, which included the digital labels for the listing.  The process of generating the HTTP "POST" request and converting the data from that POST request into a database entry for the auction listing constitutes encoding of the qualitative data in digital form, as claimed.

137.   *See § [807-1d].*   The fact that the search functionality shown in **Ex. eBay-5** was available shows that the digital labels about each auction listing were entered and stored in a

---

[4] These sets of values may have been hard-coded into the HTML form, and may have been stored in a separate database or file that was accessed in order to generate the HMTL for the form.

database so that they could be searched.  Relational databases, such as the one used by eBay, store data using various encoded data types such as for example, varchar, text, int, float, and date.

138.    Thus eBay disclosed limitations [665-1f] ("wherein producing of digital labels further comprises encoding of the qualitative data in any digital form").

**[665-1g] domiciling of these multi-parameter digital labels on at least one of the same computer, the same computer network, and on several computers linked to each other;**

139.    In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [665-1g].

140.    *See §§ [807-1f] & [807-1g]*.  Relational databases, such as the one used by eBay, store data using various encoded data types such as for example, varchar, text, int, float, and date. Each label parameter corresponds to one or more columns in the database and may correspond to one or more data items.

141.    Thus eBay disclosed limitations [665-1g] ("domiciling of these multi-parameter digital labels on at least one of the same computer, the same computer network, and on several computers linked to each other").

**[665-1h] manipulation of the said multi-parameter digital labels comprising generation of a list of at least one of websites and Internet postings that match parameters stipulated by an entity conducting a search and represented in the digital labels according to at least one of the presence of, the absence of, the numerical or other value contained in, the numerical or other value not contained in, any one, all, and any configuration of the labels that have reference to one or more websites or Internet postings; and**

142.    In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [665-1h].

143.    Manipulating digital labels to generate a list of websites/Internet postings (*e.g.* eBay auction listings) that match parameters stipulated by an entity conducting a search, where at least one of those parameters was represented in the labels according to the presence of a value

in one of the labels, describes conducting a search, such as the listings-search that was available on eBay. *See § [807-1h]. See also infra ¶ 195.*

144.    Thus, eBay disclosed limitations [665-1h] ("manipulation of the said multi-parameter digital labels comprising generation of a list of at least one of websites and Internet postings that match parameters stipulated by an entity conducting a search and represented in the digital labels according to at least one of the presence of, the absence of, the numerical or other value contained in, the numerical or other value not contained in, any one, all, and any configuration of the labels that have reference to one or more websites or Internet posting").

**[665-1i] making available the effective use of these multi-parameter digital labels and the means for their manipulation, to the general public through the Internet.**

145.    In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [665-1i].

146.    *See § [807-1h].*  In particular, as **Ex. eBay-5** shows that users could effectively search eBay using a wide variety of criteria.

147.    Thus eBay disclosed limitations [665-1i] ("making available the effective use of these multi-parameter digital labels and the means for their manipulation, to the general public through the Internet").

**[665-42] 42. The method of claim 1, wherein the creator of the website is the owner or administrator of the website, and is provided with access to edit or modify the website or the labels associated with the website.**

148.    In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [665-42].

149.    A person of ordinary skill in the art would have understood that a user could list an item for auction, then change the title, description, or picture by logging into his or her account making those changes.  A user could also cancel a listing entirely.

How can I change something or cancel my listing completely?

**Title, description, or picture information:** These can be changed as long as there are no bids on your item. Go to your item's page, look for "Update item" link near the top of the listing, and click on "revise."

If your item has already received a bid, you **can't** change any of the existing information, but you can add pictures or text by using the Adding to Your Item Description page.

**Category:** You can move your item to a different category at any time. Change your category here. When you change the category, the change will be reflected immediately on the item page, but it won't show up in the new category until the next category update is run.

**Opening bid, reserve price, quantity, or item location:** These cannot be changed. If you really want to change this information, you will need to cancel and then relist your item. See next section for instructions.

**To cancel a listing:** If there are bids on your item, you will need to end the auction and if you'd like, relist it following steps 1 through 3 below. If the item doesn't have any bids yet, you only need to do steps 1 and 3.

1. First, it's a good idea to explain why you are canceling. You can add your explanation by going to Adding to your item description.
2. Cancel each bid you have received here. In the 'Your explanation of the cancellation' text box, enter a brief, clear reason.
3. Once all of the bids have been canceled, end your listing here. NOTE: Do this quickly before another bidder has a chance to bid.

If you want to relist the item, go directly to your ended item page (find it by searching by your item number) and click "Relist item" which is below the payment and shipping terms.

**Important note about relisting Reserve Price Auctions:** You must re-enter any previous reserve price when relisting.

*GONZ-03559*

150.    Thus eBay disclosed limitations [665-42] ("The method of claim 1, wherein the creator of the website is the owner or administrator of the website, and is provided with access to edit or modify the website or the labels associated with the website").

**[665-53] 53. The method of claim 1, wherein the information encoded in a single label refers to at least one of a warranty that applies to a product for sale, the material or materials of which a product is made, to the country or geographic area where the materials for a product emanated, the way in which a product is made, the country or geographic area that a product was made in, the age of a person or the year of his/her birth, the geographic area where a person resides such as a country, region, state, city, neighborhood and district, but is not a precise address, the geographic area where a person works such as country, region, state, city, and neighborhood or district, but is not a precise address, a person's ethnic origin or ethnicity, a person's cultural origin or background, a person's ancestry or the nationality or ethnicity of a person's parents and other forebears, a person's sex, a person's sexual orientation, to a personal preference of a person, a personal belief of a person, the income or wealth of a person, to the size of a business by reference to at least one of its sales, profits, and other financial indicators, the size of a business by reference to the number of outlets or branches it has, and the size of a business by reference to the number of employees it has.**

151.    In my opinion, a person of ordinary skill in the art would have understood that eBay disclosed limitation [665-53].

152.    A person of ordinary skill in the art would understand that the individual labels available in eBay included at least the ability to designate a country or region for a particular listing, which corresponds to "the geographic area where a person resides such as a country, region, state, city, neighborhood and district, but is not a precise address." (*See **Ex. eBay-5***).

153.    Thus eBay disclosed limitations [665-53] ("The method of claim 1, wherein the information encoded in a single label refers to at least one of a warranty that applies to a product for sale, the material or materials of which a product is made, to the country or geographic area where the materials for a product emanated, the way in which a product is made, the country or geographic area that a product was made in, the age of a person or the year of his/her birth, the geographic area where a person resides such as a country, region, state, city, neighborhood and district, but is not a precise address, the geographic area where a person works such as country, region, state, city, and neighborhood or district, but is not a precise address, a person's ethnic origin or ethnicity, a person's cultural origin or background, a person's ancestry or the nationality or ethnicity of a person's parents and other forebears, a person's sex, a person's sexual

orientation, to a personal preference of a person, a personal belief of a person, the income or wealth of a person, to the size of a business by reference to at least one of its sales, profits, and other financial indicators, the size of a business by reference to the number of outlets or branches it has, and the size of a business by reference to the number of employees it has").

### B. HTML Meta-Tags Anticipated And/Or Rendered Obvious The Asserted Claims

154.    The HTML 4.01 Specification was published by the W3C on December 24, 1999.[5]  It is "prior art" to the asserted claims because it was published prior to the date of Gonzalez's alleged invention.  *See supra ¶ 13 (defining "prior art").*

155.    HTML is the publishing language of the World Wide Web.  It was widely known and used in public in the United States before July 1, 2000.  The public knowledge and use of HTML in the United States is "prior art" to the asserted claims because it occurred prior to the date of Gonzalez's alleged invention.  *See supra ¶ 13 (defining "prior art").*

### 1. HTML Meta-Tags Are "Digital Labels"

156.    HMTL is a "mark-up" language.  It uses "tags" to mark-up text into different "elements."  HTML Tags are generally denoted by < and >.  For example, <P> is a tag for a paragraph, <H1> is the tag for a top-level heading, and <LI> is the tag for a list item.

157.    One kind of HTML tag is the meta-tag, for example: <META name="author" content="John Doe">.  In this example, the <META> tag has two attributes: name and content. The values of those attributes are "author" and "John Doe", respectively.  This meta-tag states that the author of the webpage is John Doe.

---

[5] The first version of HTML 4 was HTML 4.0, published on 18 December 1997 and revised 24 April 1998.

158.    The HMTL Specification explains that meta-tag lets authors of webpages (or other HTML documents) "specify meta data information about a document rather than document content":

### 7.4.4 Meta data

*Note. The W3C Resource Description Framework (see [RDF10]) became a W3C Recommendation in February 1999. RDF allows authors to specify machine-readable metadata about HTML documents and other network-accessible resources.*

HTML lets authors specify meta data -- information about a document rather than document content -- in a variety of ways.

For example, to specify the author of a document, one may use the META element as follows:

```
<META name="Author" content="Dave Raggett">
```

The META element specifies a property (here "Author") and assigns a value to it (here "Dave Raggett").

*HTML 4.01 Specification, § 7.4.4.*

159.    As the HTML Specification explains, specifying meta data in a meta-tag is done by "[d]eclaring a property and a value for that property":

**Specifying meta data**

In general, specifying meta data involves two steps:

1. Declaring a property and a value for that property. This may be done in two ways:
   1. From within a document, via the META element.
   2. From outside a document, by linking to meta data via the LINK element (see the section on link types).
2. Referring to a profile where the property and its legal values are defined. To designate a profile, use the profile attribute of the HEAD element.

*HTML 4.01 Specification, § 7.4.4.*

160.    As a generic mechanism for specifying meta data, the HTML Specification defines the "name" attribute to indicate the name of the property, and defines the "content" attribute to indicate the value for that property.  *HTML 4.01 Specification, § 7.4.4.*  This allows the author of a web page great flexibility in using a meta tag to declare meta data.  For example:

```
<META name="author" content="John Doe">
<META name="copyright" content="&copy; 1997 Acme Corp.">
<META name="keywords" content="corporate,guidelines,cataloging">
<META name="date" content="1994-11-06T08:49:37+00:00">
```

*HTML 4.01 Specification, § 7.4.4.*

161.   The HTML Specification also defines specific types of meta-tags, including "lang" attribute:

> The lang attribute can be used with META to specify the language for the value of the content attribute. This enables speech synthesizers to apply language dependent pronunciation rules.
>
> In this example, the author's name is declared to be French:
>
> `<META name="Author" lang="fr" content="Arnaud Le Hors">`

*HTML 4.01 Specification, § 7.4.4.*

162.   The HTML Specification explains that using the "lang" meta-tag attribute is important to enable search engines to display search results using the language preferences of the user:

> improve the quality of search results. When several META elements provide language-dependent information about a document, search engines may filter on the lang attribute to display search results using the language preferences of the user. For example,
>
> ```
> <-- For speakers of US English -->
> <META name="keywords" lang="en-us"
>      content="vacation, Greece, sunshine">
> <-- For speakers of British English -->
> <META name="keywords" lang="en"
>      content="holiday, Greece, sunshine">
> <-- For speakers of French -->
> <META name="keywords" lang="fr"
>      content="vacances, Gr&egrave;ce, soleil">
> ```

*HTML 4.01 Specification, § 7.4.4.*

163.   "Title" is another specific type of meta-data that is defined by the HTML specification, one which is sufficiently important that it can also be specified in its own independent HTML tag, <TITLE>, instead of specifying it in a meta-tag:

**Note.** The META element is a generic mechanism for specifying meta data. However, some HTML elements and attributes already handle certain pieces of meta data and may be used by authors instead of META to specify those pieces: the TITLE element, the ADDRESS element, the INS and DEL elements, the title attribute, and the cite attribute.

*HTML 4.01 Specification, § 7.4.4.*

### 7.4.2 The TITLE element

```
<!-- The TITLE element is not considered part of the flow of text.
     It should be displayed, for example as the page header or
     window title. Exactly one title is required per document.
  -->
<!ELEMENT TITLE - - (#PCDATA) -(%head.misc;) -- document title -->
<!ATTLIST TITLE %i18n>
```

*Start tag:* **required**, *End tag:* **required**

*Attributes defined elsewhere*

*   lang (language information), dir (text direction)

Every HTML document **must** have a TITLE element in the HEAD section.

Authors should use the TITLE element to identify the contents of a document. Since users often consult documents out of context, authors should provide context-rich titles. Thus, instead of a title such as "Introduction", which doesn't provide much contextual background, authors should supply a title such as "Introduction to Medieval Bee-Keeping" instead.

*HTML 4.01 Specification, § 7.4.4.*

164.    A further set of meta-tags that are specifically defined by the HTML Specification are identified by the "http-equiv" attribute, which allows a webpage author to declare specific types of meta data that are defined in the HTTP Specification, RFC2616[6], including "Expires" and "Last-Modified":

---

[6] http://www.ietf.org/rfc/rfc2616.txt

44

The http-equiv attribute can be used in place of the name attribute and has a special significance when documents are retrieved via the Hypertext Transfer Protocol (HTTP). HTTP servers may use the property name specified by the http-equiv attribute to create an [RFC822]-style header in the HTTP response. Please see the HTTP specification ([RFC2616]) for details on valid HTTP headers.

The following sample META declaration:

    <META http-equiv="Expires" content="Tue, 20 Aug 1996 14:25:27 GMT">

will result in the HTTP header:

    Expires: Tue, 20 Aug 1996 14:25:27 GMT

This can be used by caches to determine when to fetch a fresh copy of the associated document.

*HTML 4.01 Specification, § 7.4.4.*
*see also RFC2616 at §§ 7.1, 14.11-17,*
*14.21 ("Expires"), 14.29 ("Last-Modified").*

165.    The HTML Specification also states that the "http-equiv" attribute can be used to include a "PICS" label in webpage:

The Platform for Internet Content Selection (PICS, specified in [PICS]) is an infrastructure for associating labels (meta data) with Internet content. Originally designed to help parents and teachers control what children can access on the Internet, it also facilitates other uses for labels, including code signing, privacy, and intellectual property rights management.

This example illustrates how one can use a META declaration to include a PICS 1.1 label:

    <HEAD>
     <META http-equiv="PICS-Label" content='
     (PICS-1.1 "http://www.gcf.org/v2.5"
       labels on "1994.11.05T08:15-0500"
         until "1995.12.31T23:59-0000"
         for "http://v3.org/PICS/Overview.html"
       ratings (suds 0.5 density 0 color/hue 1))
     '>
     <TITLE>... *document title* ...</TITLE>
    </HEAD>

*HTML 4.01 Specification, § 7.4.4.*

166.    As shown by the above, the HTML Specification (which is a "convention" because it is a published standard) defines meta-tags that are "symbolic of unambiguous qualitative data" and that are not mere character-string of unknown significance:

    <META name="Author" lang="fr" content="Arnaud Le Hors">

    <META http-equiv="Expires" content="Tue, 20 Aug 1996 14:25:27
    GMT">

```
<META http-equiv="PICS-Label" content='(PICS-1.1
"http://www.gcf.org/v2.5" labels on "1994.11.05T08:15-0500" until
"1995.12.31T23:59-0000" for "http://w3.org/PICS/Overview.html"
ratings (suds 0.5 density 0 color/hue 1))'>

<META name="date" content="1994-11-06T08:49:37+00:00">
```

167.     Thus, the meta-tags defined in the HTML 4.01 Specification are "digital labels" as that term has been construed by the court.

168.     I note that the meta-tags defined in the HTML 4.01 Specification are exactly the same as the type of digital label that the '807 and '665 patents describe as "hybrid digital labels":

> A hybrid digital label is one in which the field is unambiguously digitally defined as a certain kind of field, but the subscriber entry in the field is a character string.

> For example, a Digital Labeling Website may invite subscriber wine merchants to enumerate the wines they stock, these enumerations to be recorded in a database field which it predefines as "wine merchant stock list." The subscriber may then enter text (character strings), e.g., "Chateau Latour 1961." This entry, despite being a character string, now has a known and unambiguous significance, which is that it represents a wine of some sort offered by a wine merchant. With an appropriate interface, a site visitor could type out a particular wine name, in response to which the Host Website computer would perform a word-match search which is limited to this certain database field ("wine merchant stock list").

> *'807 patent at 6:32-46.*

169.     The example described above could be written as an HTML meta-tag as follows:

```
<META name="wine merchant stock list" content=" Chateau Latour
1961">
```

170.     This confirms my opinion that the meta-tags defined in the HTML 4.01 Specification are "digital labels" as that term has been construed by the court.

## 2.        Search Engines Enabled Search Of HMTL Meta-Tags

171.    "Prior art" search engines included Yahoo!, Altavista, Excite, and Infoseek (acquired by Go.com).  All of these search engines were publicly known and used in the United States prior to July 1, 2000.  *See supra ¶ 13 (defining "prior art").*

172.    All of the above-identified prior-art search engines scanned the HTML content of webpages, including meta-tags and enabled users to search for that content, including the meta-tags contained in the HTML.

173.    Excite and Altavista allowed searches that filter on meta-tag values, specifically the "lang" meta-tag, as shown by the following screenshots:



*Excite-1 (www.excite.com/search/advanced  on July 11, 2000)*

Manheim Invalidity Report – '807 Patent, '665 Patent



*Altavista-1 (www.altavista.com on Feb. 8, 1999)*

174.     Infoseek/Go.com also allowed searches specifically filtering on meta-tag values, specifically the "title" tag, as shown by the following screenshot:



*Infoseek-1 (www.go.com/find?pg=advanced on Aug. 27, 1999)*

48

175.     Infoseek/Go.com further also allowed searches that further specifically filtered based on its category-classifications, as shown by the following screenshot:



*Infoseek-2 (www.go.com/find?pg=advanced on Aug. 27, 1999)*

### 3.     The Asserted Claims Are Anticipated And/Or Rendered Obvious By HTML Meta-Tags

176.     In my opinion, the public knowledge and use of search engines that indexed the HTML meta-tags in websites anticipates, or at least renders obvious, claims 1, 42 and 53 of the '665 patent.

177.     In my opinion, the public knowledge and use of search engines that indexed the HTML meta-tags in websites that were generated with a web-authoring tool such as Dreamweaver or FrontPage, renders obvious claims 1, 2 and 3 of the '807 patent.

**[665-1a] 1. A method for multi-parameter digital labelling of Internet Websites, comprising:**

178.     Meta-tags are the claimed digital labels, as described above.  *See supra § V.B.1. Meta-Tags Are "Digital Labels"*.  Meta-tags are "multi-parameter" digital labels when more than one meta-tag is used on a webpage.  That is typically the case.  For example, a webpage that

had meta-tags identifying its title, language, and author would have a multi-parameter digital labels because title, language, and author are three different parameters.

179.     Thus, limitation [665-1a] is anticipated.

**[665-1b] gathering of unambiguous, multi-parameter qualitative data**

**[665-1c] concerning a single or a plurality of at least one of an Internet website, an Internet posting, their substantive contents, and their owner or creator;**

180.     Meta-tags are part of the HMTL document that constitutes a webpage.  They are "gathered" and included in the webpage by its author/creator/owner, and they reflect unambiguous, multi-parameter qualitative data about the website, its contents, and/or its owner/creator.  For example, of the language of the website, the title of the website, or the author of the website are all unambiguous qualitative data about the website.  The same is also true of the data reflected in many other meta-tags, such as a date for the contents of the website, an expiration-date for the contents of the website, a PICS label showing that a website contains adult content, *etc.  See supra § V.B.1. Meta-Tags Are "Digital Labels"*.

181.     Thus, limitations [665-1b] and [665-1c] are anticipated.

**[665-1d] sourcing, from the owner or creator of said website or Internet posting, each said item of qualitative data referring to said website, said internet posting, or its substantive contents or its owner or creator;**

182.     The data for meta-tags is "sourced" from the owner or creator of the website because they are included in the webpage by its creator/owner.  *See supra § V.B.1. Meta-Tags Are "Digital Labels"*.

183.     Thus, limitation [665-1d] is anticipated.

**[665-1e] producing a plurality of digital labels for each said website or internet posting,**

184.    Meta-tags are part of the HMTL document that constitutes a webpage, and are included in the webpage by its author/creator/owner.  Thus, the meta-tags for a webpage are "produced" when the webpage is created by its author/creator/owner.

185.    Thus, limitation [665-1e] is anticipated.

**[665-1f] wherein each digital label uniquely refers to and represents a particular item of qualitative information;**

186.    Meta-tags uniquely refer to and represent a particular item of information, for example the language of the website, the title of the website, or the date of the website's content (or a part of its content).

187.    Thus, limitation [665-1f] is anticipated.

**[665-1g] wherein producing of digital labels further comprises encoding of the qualitative data in any digital form;**

188.    Meta-tags are part of the HMTL document that constitutes a webpage, and are included in the webpage by its author/creator/owner.  Thus, the meta-tags for a webpage are "produced" by "encoding" them in "digital form" (*i.e.* encoded in HTML, which is a digital form) when the webpage is created by its author/creator/owner.  Further, HTML meta tags include character encoding defined by the charset attribute - http://www.w3.org/TR/html4/charset.html#h-5.2.2.

189.    Thus, limitation [665-1g] is anticipated.

**[665-1h] domiciling of these multi-parameter digital labels on at least one of the same computer, the same computer network, and on several computers linked to each other**

190.    Meta-tags are part of the HMTL document that constitutes a webpage, and are included in the webpage by its author/creator/owner.  Thus, the meta-tags for a webpage are "domiciled" on the computer that hosts the webpage.

191.    Meta-tags are also gathered and "domiciled" on the computers of a search-engine such as Altavista, Excite, and Infoseek/Go.com, when the search engine indexes/crawls the webpage.

192.    Thus, limitation [665-1h] is anticipated.

**[665-1i] manipulation of the said multi-parameter digital labels comprising generation of a list of at least one of websites and Internet postings that match parameters stipulated by an entity conducting a search and represented in the digital labels according to at least one of the presence of, the absence of, the numerical or other value contained in, the numerical or other value not contained in, any one, all, and any configuration of the labels that have reference to one or more websites or Internet postings; and**

193.    Search engines manipulated meta-tags to generate a list of websites that matched parameters stipulated by an entity conducting a search, where at least one of those parameters was represented in the meta-tags according to the presence of a value in one of the meta-tags. For example, Altavista and Excite allowed searches that filtered on the presence of "fr" (symbolizing language="French") in the "lang" meta-tag.  This is what the '807 and '665 patents refer to as a "pure digital label."   Similarly, Infoseek/Go.com allowed searches that filtered on the presence of a particular category selected by a user from a drop-down menu of categories. This is another example of what the '807 and '665 patents refer to as a "pure digital label." Furthermore, Infoseek/Go.com allowed searches that filtered on the presence of particular user-specified text in the "title" tag of a webpage.  This is an example of what the '807 and '665 patents refer to as a "hybrid digital label."

194.    Thus, limitation [665-1i] is anticipated.

195.    I note that while the language of this claim encompasses more complex permutations of digital-label based searches, as would be allowed for example by the prior art Excite On-line Personals search that is shown in the partial screenshot below (which includes

labels for body type, ethnicity, religion, etc.), it is satisfied by a search for a single value contained in a single label.



*Excite-2 (personals.excite.com… on June 22, 2000)*

196.    Performing a search that filters based on the presence of multiple values in multiple fields/labels was well-known and trivial technique, as this was a standard feature in all relational databases that existed as of July 1, 2000, as far as I am aware—certainly all databases that could be queried with SQL.  Similarly, specifying such a search using an web-page form

was also a well-known, widely used, and trivial technique, as shown for example by the Excite personals-search form above.  Thus, even if it were determined that limitation [665-1i] requires filtering on multiple values of multiple labels (which as stated above is not correct in my opinion), it would still be both anticipated and obvious.

**[665-1j] making available the effective use of these multi-parameter digital labels and the means for their manipulation, to the general public through the Internet.**

197.    As explained in the context of limitation [665-1i] above, search engines allowed users to perform searches, including searches filtered based on values for meta-tags.  These search engines were available to the general public through the Internet.

198.    Thus, limitation [665-1g] is anticipated.

**[665-42] 42. The method of claim 1, wherein the creator of the website is the owner or administrator of the website, and is provided with access to edit or modify the website or the labels associated with the website.**

199.    Meta-tags are part of the HTML of a webpage, and thus the owner or administrator of the website/webpage has access to edit or modify them.  Any edits made by to the meta-tags a webpage will be indexed by a search engine whenever it next crawls that webpage.

200.    Thus, limitation [665-42] is anticipated.

**[665-53] 53. The method of claim 1, wherein the information encoded in a single label refers to at least one of a warranty that applies to a product for sale, the material or materials of which a product is made, to the country or geographic area where the materials for a product emanated, the way in which a product is made, the country or geographic area that a product was made in, the age of a person or the year of his/her birth, the geographic area where a person resides such as a country, region, state, city, neighborhood and district, but is not a precise address, the geographic area where a person works such as country, region, state, city, and neighborhood or district, but is not a precise address, a person's ethnic origin or ethnicity, a person's cultural origin or background, a person's ancestry or the nationality or ethnicity of a person's parents and other forebears, a person's sex, a person's sexual orientation, to a personal preference of a person, a personal belief of a person, the income or wealth of a person, to the size of a business by reference to at least one of its sales, profits, and other financial indicators, the size of a business by reference to the number of outlets or branches it has, and the size of a business by reference to the number of employees it has.**

201.    The "lang" meta-tag refers indirectly to the geographic area where the website emanates, because different languages are spoken in different geographic areas.

202.    Thus, limitation [665-42] is anticipated.

*[807-1a]* **1. A <u>host website apparatus</u> for listing subscribers comprising: a computer system,**

*[807-3a]* **3. A method for listing websites on the Internet comprising the steps of: configuring a computer system.**

203.    A search engine such as Altavista, Excite, and Infoseek/Go.com is a host website for listing other websites that comprises a computer system, which is an apparatus.

204.    Thus the public knowledge and use of search engines that indexed the HTML meta-tags in websites that were generated with a web-authoring tool such as Dreamweaver or FrontPage renders obvious limitations [807-1a] and [807-3a].

*[807-1b]* **said computer system includes a digital label database for providing to a listing subscriber**

*[807-3b]* **to compile a digital label database for providing to a listing subscriber**

205.    Web-authoring tools such as Dreamweaver or FrontPage were widely known and used before July 1, 2000, and many pages created with such tools were available on the internert and indexed by search engines.

206.    Web-authoring tools such as Dreamweaver or FrontPage were configured to add meta-tags to webpages.  This is shown, for example, by the provisional application that Gonzalez filed with the Patent Office (No. 60/238,303). At page 55, it includes a small section of HTML that was generated by Microsoft FrontPage 4.0, and this HTML includes several meta-tags. While this specific example does not include the "lang" meta-tag, it would have been obvious to configure FrontPage or DreamWeaver to assist a user in labeling the website being created with the proper language by presenting a drop-down menu with a selection of languages, and then creating a "lang" meta-tag based on the user's selection.  If this were the case, it would include a digital label database for providing a list of digital labels to the user, in order to assist users in creating websites and applying digital labels, specifically meta-tags, to those websites.

207.    Thus the public knowledge and use of search engines that indexed the HTML meta-tags in websites that were generated with a web-authoring tool such as Dreamweaver or FrontPage renders obvious limitation [807-1b] and [807-3b].

***[807-1c] digital labels representing different specific qualities***

***[807-3c] digital labels representing different specific qualities***

208.    Meta-tags are digital labels representing different specific qualities, as described above.

209.    Thus the public knowledge and use of search engines that indexed the HTML meta-tags in websites that were generated with a web-authoring tool such as Dreamweaver or FrontPage renders obvious limitation [807-1c] and [807-3c].

**[807-1d] and a subscriber database for storing a listing of subscribers' digital labels;**

**[807-3d] and to compile a subscriber database for storing a listing of subscribers' digital labels;**

210.    A search engine such as Altavista, Excite, and Infoseek/Go.com used a database to store information about the websites it indexed, including the meta-tags from those websites that it indexed.  Also as described above, Altavista, Excite, and Infoseek/Go.com enabled the public to search for meta-tags, including for example the "lang" meta-tag.  This confirms that those meta-tags were stored in a database.

211.    Thus the public knowledge and use of search engines that indexed the HTML meta-tags in websites that were generated with a web-authoring tool such as Dreamweaver or FrontPage renders obvious limitation [807-1d] and [807-3d].

**[807-1e] said computer system being configured to respond to a subscriber's request for listing and guiding the subscriber via the Host Website display to enter information pertaining to the subscriber and**

**[807-1f] converting the information to digital labels**

**[807-1g] by accessing said digital label database and storing the subscriber's digital labels in said subscriber database; and**

**[807-3e] configuring said computer system to respond to a subscriber's request for listing; guiding the subscriber via a website display to enter information pertaining to the subscriber; and**

**[807-3f] converting the information to digital labels; &**

**[807-3g] by accessing said digital label database and storing subscriber digital labels in Host Website databases**

212.    Web-authoring tools such as Dreamweaver or FrontPage ran on computers and were configured to respond to a user's requests to assist in creating a website, and would guide the user via the computer's display to enter information pertaining to the user in order to assist in creating the website.   These web-authoring tools included databases of information about

formatting and syntax of HMTL, including meta-tags, and used these databases to assist users in converting the information that they entered into digital labels, such as meta-tags, for the website.

213.    Furthermore, as discussed above, a search engine such as Altavista, Excite, and Infoseek/Go.com used a database to store information about the websites it indexed, including the meta-tags from those websites that it indexed, which would have included meta-tags on websites created with Dreamweaver or FrontPage.

214.    Thus the public knowledge and use of search engines that indexed the HTML meta-tags in websites that were generated with a web-authoring tool such as Dreamweaver or FrontPage renders obvious limitations [807-1e], [807-1f] and [807-1g], as well as [807-3e], [807-3f], and [807-3g].

**[807-1h]** said computer system further configured to enable users to <u>search</u> said subscriber database <u>for subscriber digital labels</u> identifying subscriber qualities.

215.    As described above, Altavista, Excite, and Infoseek/Go.com enabled the public to search for meta-tags, including for example the "lang" meta-tag.  The "lang" meta-tag identifies what the claim refers to as a  "subscriber quality": the language of the subscriber's website.

216.    Thus the public knowledge and use of search engines that indexed the HTML meta-tags in websites that were generated with a web-authoring tool such as Dreamweaver or FrontPage renders obvious limitation [807-1h].

**[807-2]** 2. A website as in claim 1 in which the website is configured for a specific subject.

217.    The Altavista, Excite, and Infoseek/Go.com search engines including subsections that were configured for specific subjects, as shown by the following screenshots:

58

Manheim Invalidity Report – '807 Patent, '665 Patent



*Excite-1 (www.excite.com/search/advanced  on July 11, 2000)*

*Altavista-1 (www.altavista.com on Feb. 8, 1999)*

*Infoseek-1 (www.go.com/find?pg=advanced on Aug. 27, 1999)*

218.    Thus the public knowledge and use of search engines that indexed the HTML meta-tags in websites that were generated with a web-authoring tool such as Dreamweaver or FrontPage renders obvious limitation [807-2].

## C.    Library Card Catalogs Rendered Obvious The Asserted Claims

219.    The use of labels to organize and facilitate searches of large amounts of information had been known for a long time prior to July 1, 2000.  Library card catalogues are a simple example of how labels were used to do this.  The Dewey Decimal Classification system dates back to the 19th century.  It was first published in 1876, and by 1930 the Library of Congress was printing Dewey numbers on catalog cards.  (*See* http://www.oclc.org/dewey/resources/timeline.en.html).  Library cards are widely known and used.  I personally used library cards in physical form, even while computer technology was supplementing the physical card catalogs—which by July 1, 2000 was widespread.

220.    The public knowledge and use of library cards in the United States is "prior art" to the asserted claims because it occurred prior to the date of Gonzalez's alleged invention, and it

renders obvious the asserted claims for the reasons described below.  *See supra ¶ 13 (defining "prior art"); ¶¶ 21-29 (defining "obviousness")*

### 1.     Library Card Catalogs Use Labels Such As Author, Title, Subject, And Library of Congress Classification

221.    The card catalogs in libraries used labels: author, title, subject, and classification (usually the Library of Congress Classification).  The images of library cards shown below each have all of these labels.  Each individual book would have multiple copies of its associated card in various places in the library's card-catalog: one in the author catalog, one in the title catalog, and typically several in the subject catalog.







*The University of South Carolina Library's "Card of the Day" photo-album,*
*https://www.flickr.com/photos/41318675@N05/sets/72157622083241936/*

### 2.    Library Card Catalogs Enabled Search Using Labels Such As Author, Title, Subject, And Library of Congress Classification

222.    A person could search the card catalog in a library based on various combinations of the labels.  For example, one could search the Author or Title catalogues knowing that they were arranged alphabetically.  One could also search through the Subject catalog, which would typically have the cards for all the books in each subject ordered by author.

**[807-1a] 1. A <u>host website apparatus</u> for listing subscribers comprising: a computer system,**

223.    In my opinion, a person of ordinary skill in the art would have considered limitation [807-1a] obvious in view of library cards.

224.    Library cards provided a classification system for organizing references in a library.  It would have been obvious to a person of ordinary skill in the art to use this organizational system for other things, including websites.  Using a computer to organize websites using the classification system found on library cards would have predictably resulted in the use of the known library card classification system implemented on a computer system for organizing websites (or anything else that could be classified and organized—by July 1, 2000 many libraries had already created databases with the information on their card catalogs, which allowed much faster searching).

225.    Thus library cards rendered obvious limitation [807-1a] ("A host website apparatus for listing subscribers comprising: a computer system").

**[807-1b] said computer system includes a <u>digital label database</u> for providing to a listing subscriber**

226.    In my opinion, a person of ordinary skill in the art would have recognized that library cards render limitation [807-1b] obvious.

227.    Library cards were stored in a physical catalog, organized by labels such as Title, Author, Subject, and classification.  It would have been obvious to a person of ordinary skill in the art to combine the functionality of this card catalog database with any other type of information that could be classified, and to do so on a computer.  This would have predictably resulted in the card catalog classification system, implemented with information classified according to that system combined on a computer-based database.

228.     Thus library cards rendered obvious limitation [807-1b] ("said computer system includes a digital label database for providing to a listing subscriber").

**[807-1c] <u>digital labels</u> representing different specific qualities**

229.     In my opinion, a person of ordinary skill in the art would have appreciated that library cards rendered obvious limitation [807-1c].

230.     Library cards included labels for many specific qualities: Title, Subject, Author, and classification.  It would have been obvious to a person of ordinary skill in the art to combine the functionality of the labels on library cards contained in a card catalog database with a computer.  This would have predictably resulted in a computer-implemented database wherein information is classified according to relevant topics using the type of classification system that library cards provided for publications.

231.     Thus library cards rendered obvious limitation [807-1c] ("said computer system includes a digital label database for providing to a listing subscriber").

**[807-1d] and a <u>subscriber database</u> for storing a listing of subscribers' digital labels;**

232.     In my opinion, a person of ordinary skill in the art would have understood that library cards render limitation [807-1d] obvious.

233.     Library cards were stored in a catalog of cards.  Publishers provided at least the Title, Author, Subject, and library of congress number for publications.  In books, for example, the inside cover of a book usually contains all of this information, provided by the publisher.  It would have been obvious to a person of ordinary skill in the art to combine the functionality of the labels that are provided by publishers and recorded on library cards on a computer.  This would have predictably resulted in a computer-based database for classifying information using the type of classification system that library cards provided for publications.

234. Thus library cards rendered obvious limitation [807-1d] ("and a subscriber database for storing a listing of subscribers' digital labels").

**[807-1e] said computer system being configured to respond to a subscriber's request for listing and <u>guiding the subscriber via the Host Website display to enter information pertaining to the subscriber</u> and**

235. In my opinion, a person of ordinary skill in the art would have appreciated that library cards rendered limitation [807-1e] obvious.

236. A person of ordinary skill in the art would have understood that librarians routinely purchase books from publishers. The Library of Congress provides a coding system that libraries and publishers use to label publications. Publishers labeled their publications in accordance with this coding system, and libraries recorded this information on cards and catalogued the cards accordingly. It would have been obvious to a person of ordinary skill in the art to combine the functionality of the labels that are provided by publishers and recorded on library cards on a computer. This would have predictably resulted in a computer-based database for classifying information using the type of classification system that library cards provided for publications.

237. Thus library cards rendered obvious limitation [807-1e] ("said computer system being configured to respond to a subscriber's request for listing and guiding the subscriber via the Host Website display to enter information pertaining to the subscriber").

**[807-1f] converting the information to digital labels; &**

**[807-1g] by accessing said digital label database and storing the subscriber's digital labels in said subscriber database; and**

238. In my opinion, a person of ordinary skill in the art would have appreciated that library cards rendered limitations [807-1f] & [807-1g] obvious.

239.    A person of ordinary skill in the art would have understood that the labels contained in publications in accordance with the coding system provided by the Library of Congress are copied onto cards and cataloged in a card catalog database.  It would have been obvious to a person of ordinary skill in the art to convert these physical library cards into digital library cards in a computer system and to store the digitized cards in that system.  Doing so would have been the predictable result of using known techniques to enter data on a computer, with the result being a computer-based database for storing digitized library-card-type classifications for information using the type of classification system that library cards provided for publications.

240.    Thus library cards rendered obvious limitation [807-1f] ("converting the information to digital labels") and [807-1g] ("by accessing said digital label database and storing the subscriber's digital labels in said subscriber database").

**[807-1h] said computer system further configured to enable users to <u>search</u> said subscriber database <u>for subscriber digital labels</u> identifying subscriber qualities.**

241.    In my opinion, a person of ordinary skill in the art would have appreciated that library cards rendered limitations [807-1h] obvious.

242.    A person of ordinary skill in the art would have understood that library patrons could search a card catalog database using the Library of Congress coding system. Indeed the purpose of a card catalog is to facilitate searching. Card catalogs were organized into multiple catalogs by, respectively, subscriber qualities like Title, Subject, Author, and Classification.  It was well-known to use any of these categories to begin a search and to continue narrowing that search in an iterative fashion through the catalog organization.  It would have been obvious to a person of ordinary skill in the art to take the type of labels used in physical card catalogs and convert them for use on a computer.  Doing so would have been trivial, and merely the

predictable result of using known computer techniques with the result being digitized card catalogs that users could use to search for publications.

243.    Thus library cards rendered obvious limitation [807-1h] ("said computer system further configured to enable users to search said subscriber database for subscriber digital labels identifying subscriber qualities").

**[807-2] 2. A website as in claim 1 in which the website is configured for a specific subject.**

244.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [807-2] obvious.

245.    A person of ordinary skill in the art would have recognized that library cards were configured for specific subjects in several ways.  Library cards for a particular publication included a subject of that publication, and card catalogs could be configured to contain library cards for each publication available in that particular library.  It would have been obvious to a person of ordinary skill in the art to convert physical card catalogs into digital form, and to use the classification system embodied in library cards to classify publications (or other things, as desired) for a specific subject.  The predictable result of digitizing a card catalog for a particular subject (either a specific subject within each catalog, or a specific library) and making the catalog available in digital form such as through a website would have been the classification system of library cards with a website configured for a specific subject.

246.    Thus library cards disclosed limitation [807-2] ("A website as in claim 1 in which the website is configured for a specific subject").

**[807-3a] 3. A method for listing websites on the Internet comprising the steps of: configuring a computer system.**

247.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [807-3a] obvious.

248.    *See § [807-1a]*.

249.    Thus library cards rendered obvious limitation [807-3a] ("A method for listing websites on the Internet comprising the steps of: configuring a computer system").

**[807-3b] to compile a digital label database for providing to a listing subscriber**

250.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [807-3b] obvious.

251.    *See § [807-1b]*.

252.    Thus library cards rendered limitation [807-3b] ("to compile a digital label database for providing to a listing subscriber").

**[807-3c] digital labels representing different specific qualities**

253.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [807-3c] obvious.

254.    *See § [807-1c]*.

255.    Thus library cards rendered obvious limitation [807-3c] ("digital labels representing different specific qualities").

**[807-3d] and to compile a subscriber database for storing a listing of subscribers' digital labels;**

256.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [807-3d] obvious.

257.    *See § [807-1d]*.

258.    Thus library cards rendered obvious limitation [807-3d] ("to compile a subscriber database for storing a listing of subscribers' digital labels").

**[807-3e] configuring said computer system to respond to a subscriber's request for listing; guiding the subscriber via a website display to enter information pertaining to the subscriber; and**

259.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [807-3e] obvious.

260.    *See § [807-1e].*

261.    Thus library cards rendered obvious limitation [807-3e] ("configuring said computer system to respond to a subscriber's request for listing; guiding the subscriber via a website display to enter information pertaining to the subscriber").

**[807-3f] converting the information to digital labels; &**

**[807-3g] by accessing said digital label database and storing subscriber digital labels in Host Website databases**

262.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitations [807-3f] and [807-3g] obvious.

263.    *See §§ [807-1f], [807-1g], & [807-1h].*

264.    Thus library cards rendered obvious limitations [807-3f] ("converting the information to digital labels") and [807-3g] ("by accessing said digital label database and storing subscriber digital labels in Host Website databases").

**[665-1a] 1. A method for multi-parameter digital labelling of Internet Websites, comprising:**

265.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [665-1a] obvious.

266.    *See §§ [807-1b] & [807-1c].*

267.    Thus library cards rendered obvious limitations [665-1a] ("A method for multi-parameter digital labelling of Internet Websites, comprising").

**[665-1b] gathering of unambiguous, multi-parameter qualitative data**

268.    In my opinion, a person of ordinary skill in the art would have understood that library cards discose limitation [665-1b].

269.    *See § [807-1e]*. Library cards, and the card catalogs in which they were located, featured unambiguous, multi-parameter qualitative data including Title, Author, Subject, and classification.

270.    Thus library cards disclosed limitations [665-1b] ("gathering of unambiguous, multi-parameter qualitative data").

**[665-1c] concerning a single or a plurality of at least one of an Internet website, an Internet posting, their substantive contents, and their owner or creator;**

271.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [665-1c] obvious.

272.    *See § [807-1e]*.

273.    Thus library cards rendered obvious limitations [665-1c] ("concerning a single or a plurality of at least one of an Internet website, an Internet posting, their substantive contents, and their owner or creator").

**[665-1d] sourcing, from the owner or creator of said website or Internet posting, each said item of qualitative data referring to said website, said internet posting, or its substantive contents or its owner or creator;**

274.    In my opinion, a person of ordinary skill in the art would have understood that library cards disclosed limitation [665-1d].

275.    A publisher provided Title, Author, Subject, and classification numbers for each publication, and this information was recorded on library cards and used in card catalogs.  It would have been obvious to a person of ordinary skill in the art to apply this classification system to other things, including websites, and to do so using a computer.  Using known

techniques for encoding basic data on a computer combined with the classification system used in library cards would have predictably resulted in a computer-based cataloging system wherein the owner or creator of a catalogued item provided the catalog information in the same manner that a publisher provided information for the card catalog system.

276.    Thus library cards rendered obvious limitation [665-1d] ("sourcing, from the owner or creator of said website or Internet posting, each said item of qualitative data referring to said website, said internet posting, or its substantive contents or its owner or creator").

**[665-1e] producing a plurality of digital labels for each said website or internet posting, wherein each digital label uniquely refers to and represents a particular item of qualitative information;**

277.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [665-1e] obvious.

278.    *See § [807-1h]*.    In particular, a person of ordinary skill in the art would understand that searchable labels like Title, Author, Subject, and classification render this claim limitation obvious.

279.    Thus library cards rendered obvious limitations [665-1e] ("producing a plurality of digital labels for each said website or internet posting, wherein each digital label uniquely refers to and represents a particular item of qualitative information").

**[665-1f] wherein producing of digital labels further comprises encoding of the qualitative data in any digital form;**

280.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [665-1f] obvious.

281.    *See § [807-1d]*.    In particular, a person of ordinary skill in the art would have understood that library cards could be encoded using any number of well-known techniques for recording data on a computer in a database.

282.    Thus library cards rendered obvious limitation [665-1f] ("wherein producing of digital labels further comprises encoding of the qualitative data in any digital form").

**[665-1g] domiciling of these multi-parameter digital labels on at least one of the same computer, the same computer network, and on several computers linked to each other;**

283.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [665-1g] obvious.

284.    *See §§ [807-1f] & [807-1g]*.

285.    Thus library cards rendered obvious limitations [665-1g] ("domiciling of these multi-parameter digital labels on at least one of the same computer, the same computer network, and on several computers linked to each other").

**[665-1h] manipulation of the said multi-parameter digital labels comprising generation of a list of at least one of websites and Internet postings that match parameters stipulated by an entity conducting a search and represented in the digital labels according to at least one of the presence of, the absence of, the numerical or other value contained in, the numerical or other value not contained in, any one, all, and any configuration of the labels that have reference to one or more websites or Internet postings; and**

286.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [665-1h] obvious.

287.    *See § [807-1h]*.  In particular, a library patron could search through library cards in a card catalog using Title, Author, Subject, or classification manually to locate one or more labels as desired.  *See also supra ¶ 195*.

288.    Thus library cards rendered obvious limitations [665-1h] ("manipulation of the said multi-parameter digital labels comprising generation of a list of at least one of websites and Internet postings that match parameters stipulated by an entity conducting a search and represented in the digital labels according to at least one of the presence of, the absence of, the numerical or other value contained in, the numerical or other value not contained in, any one, all,

and any configuration of the labels that have reference to one or more websites or Internet posting").

**[665-1i] making available the effective use of these multi-parameter digital labels and the means for their manipulation, to the general public through the Internet.**

289.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [665-1i] obvious.

290.    *See § [807-1h]*.  In particular, library users could effectively search card catalogs using Title, Subject, Author, or classification.

291.    Thus library cards rendered obvouis limitations [665-1i] ("making available the effective use of these multi-parameter digital labels and the means for their manipulation, to the general public through the Internet").

**[665-42] 42. The method of claim 1, wherein the creator of the website is the owner or administrator of the website, and is provided with access to edit or modify the website or the labels associated with the website.**

292.    In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [665-42] obvious.

293.    A person of ordinary skill in the art would have understood that publishers provide Title, Author, Subject, and classification labels in accordance with the Library of Congress coding system.  When this information changed (e.g., new versions of a book, additional authors for new editions, etc.) the publisher could and would update the associated labels accordingly. It would have been obvious to a person of ordinary skill in the art to combine the classification system used in library cards, wherein the publisher provides information about its books, with a computer-based system for classifying publications (or other things, as desired). Doing so would have predictably resulted in the classification system of library cards

implemented to classify publications or other information on a website, and the information would be provided by the owner or administrator.

294.     Thus library cards rendered obvious limitations [665-42] ("The method of claim 1, wherein the creator of the website is the owner or administrator of the website, and is provided with access to edit or modify the website or the labels associated with the website").

**[665-53] 53. The method of claim 1, wherein the information encoded in a single label refers to at least one of a warranty that applies to a product for sale, the material or materials of which a product is made, to the country or geographic area where the materials for a product emanated, the way in which a product is made, the country or geographic area that a product was made in, the age of a person or the year of his/her birth, the geographic area where a person resides such as a country, region, state, city, neighborhood and district, but is not a precise address, the geographic area where a person works such as country, region, state, city, and neighborhood or district, but is not a precise address, a person's ethnic origin or ethnicity, a person's cultural origin or background, a person's ancestry or the nationality or ethnicity of a person's parents and other forebears, a person's sex, a person's sexual orientation, to a personal preference of a person, a personal belief of a person, the income or wealth of a person, to the size of a business by reference to at least one of its sales, profits, and other financial indicators, the size of a business by reference to the number of outlets or branches it has, and the size of a business by reference to the number of employees it has.**

295.     In my opinion, a person of ordinary skill in the art would have understood that library cards rendered limitation [665-53] obvious.

296.     A person of ordinary skill in the art would understand that the individual labels available in library cards were particular to publications rather than personal ads, classified ads, or job listings.  It would have been obvious to a person of ordinary skill in the art to combine the classification system of library cards with any relevant labels for a particular type of classification system including the labels suggested in claim 53.  Doing so would have been the predictable result of using known techniques to combine the classification system of library cards with the type of information utilized in personal ads, classified ads, or job listings.  In fact, library cards already listed information relating to a publisher's location like city, country, etc.,

and it would have been obvious to provide card catalogs to conduct searches organized by this type of information instead of or in addition to information like Title, Author, or Subject.

297.     Thus library cards rendered obvious limitations [665-53] ("The method of claim 1, wherein the information encoded in a single label refers to at least one of a warranty that applies to a product for sale, the material or materials of which a product is made, to the country or geographic area where the materials for a product emanated, the way in which a product is made, the country or geographic area that a product was made in, the age of a person or the year of his/her birth, the geographic area where a person resides such as a country, region, state, city, neighborhood and district, but is not a precise address, the geographic area where a person works such as country, region, state, city, and neighborhood or district, but is not a precise address, a person's ethnic origin or ethnicity, a person's cultural origin or background, a person's ancestry or the nationality or ethnicity of a person's parents and other forebears, a person's sex, a person's sexual orientation, to a personal preference of a person, a personal belief of a person, the income or wealth of a person, to the size of a business by reference to at least one of its sales, profits, and other financial indicators, the size of a business by reference to the number of outlets or branches it has, and the size of a business by reference to the number of employees it has").

### D.     Mr. Gonzalez Made Factually Incorrect Statements To The Patent Office During Prosecution Of The '807 And '665 Patents

298.     The '807 and '665 patents claim priority to a U.S. Provisional Patent Application (No. 60/238,303) filed with the Patent Office on October 4, 2000.

299.     The '807 patent issued from U.S. Patent Application No. 10/849,075, which was filed on May 18, 2004.  That application was a continuation of U.S. Patent Application No. 09/791,440, which was filed Feb. 22, 2001, and claimed priority to the provisional application filed on October 4, 2000.

300.    The '665 patent issued from U.S. Patent Application No. 12/624,350, which was filed on November 23, 2009.   That application was a continuation-in-part of U.S. Patent Application No. 09/791,440, described above.

301.    During the prosecution of the 09/791,440 application (which led to both the '807 and '665 patents), Mr. Gonzalez personally prepared a letter to be faxed to the Patent Office in response to the Examiner's request for a "a specific explanation" of "differentiating aspects of applicants teaching," *i.e.* for an explanation of why the invention was different from the prior art:

**RE:Gonzalez, Emmanuel (Application # 09/791,440)**

.

**Dear Examiner Woo:**
Per our teleconference on Wednesday 11/6/07, this is in response to your request to fax you a specific explanation and differentiating aspects of applicants teaching before we schedule an interview.  I look forward to your early response

*GONZ-00720-724 at 721.*

302.    In this letter to the Patent Office, Mr. Gonzalez made a number of statements about "meta-tags" that are that are incorrect and demonstrate a lack of understanding regarding one of the basic features of HTML, meta-tags.   *See infra § V.A (describing HMTL meta-tags).* Generally speaking, throughout the letter Mr. Gonzalez appears to use the word "meta-tag" to refer to a specific type of meta-tag, namely the "keywords" type of meta-tag:

```
<-- For speakers of US English -->
<META name="keywords" lang="en-us"
      content="vacation, Greece, sunshine">
<-- For speakers of British English -->
<META name="keywords" lang="en"
      content="holiday, Greece, sunshine">
```

*HTML 4.01 Specification, § 7.4.4.*

303.    Generally, the letter shows that Mr. Gonzalez either deliberately mislead the Patent Office, or else did not understand that there were many types of meta-tag in HTML other than "keywords," including meta-tags that did exactly what he told the Patent Office that he invented.  For example, Mr. Gonzalez tells the Patent Office that an example of the digital labels that he invented is "LOC=United States, US, New York, New York City, NYC, Manhattan, Morningside Heights", and that this digital label is "far superior to a mere meta-tag":

> "Hybrid" labels are those that are not purely in code, but rather take a character-string and attribute particular meaning to it. In this way, many types of information could be digitally labeled, even if not foreseen in detail by the convention. For example, it could be agreed that the prefix "LOC=" identifies character strings which relate to geographic location, e.g., "LOC=United States, US, New York, New York City, NYC, Manhattan, Morningside Heights". It can easily be appreciated that this is far superior to a mere meta-tag "New York City" which could mean almost anything.

*GONZ-00722*

304.    This statement is incorrect.  The digital label that Mr. Gonzalez says he invented could easily have been written as an HTML meta-tag by any web developer:

```
<META name="LOC" content="United States, US, New York,New York
City, NYC, Manhattan, Morningside Heights">
```

305.    It could have been written easily as a series of HMTL meta-tags:

```
<META name="LOC" content="United States">
<META name="LOC" content="US">
<META name="LOC" content="New York">
<META name="LOC" content="New York City">
<META name="LOC" content="NYC">
<META name="LOC" content="Manhattan">
<META name="LOC" content="Morningside Heights">
```

306.    Later on the same page of his letter to the Patent Office, Mr. Gonzalez provides another example:

> In contrast, if websites were *digitally labeled* as proposed by the Invention, then all physical hotel websites would contain the same label, say "A=TT001", and those that are in Rome would have another label like "LOC=Southern Europe, Italy, Rome, Piazza Navona". One would only have to ask the search engine to "Find all websites where 'A=TT001' and 'LOC=Rome'". The result would be a 100% accurate list of hotels in Rome, with no non-hotels.

*GONZ-00722*

307.     Again, contrary to Mr. Gonzalez's claim that he invented digital labels that are different from meta-tags, the example he provided of a digital label could easily have been written as HTML meta-tags by any web developer:

```
<META name="LOC" content="Southern Europe">
<META name="LOC" content="Italy">
<META name="LOC" content="Rome">
<META name="LOC" content="Piazza Navona">
```

308.     Mr. Gonzalez then tells the Patent Office that there is "no prior art for website labels":

> **There is no prior art at all for website labels, much less digital website labels.** Most of the numerous inventions cited by Examiner Woo refer to notations made by *second-party* search engines or *third-party* surfers, not by the *first party*, viz., each website's own creators/owners. Such notations may describe *a surfer's* (or search engine's) private opinions and notes. But they are not "labels" in the sense of clear, unambiguous information provided by the *maker* to describe the nature or contents of its own product. (Moreover, it is impractical for second or third parties to make labels for large numbers of websites, whereas if each owner would do it for his/her own site, then conceivably all the websites on the entire Internet could be digitally labeled in a very short time without.)

*GONZ-00723*

309.     Mr. Gonzalez's statement that there is "no prior art for website labels" is fundamentally incorrect because the very definition of HTML, the language in which all websites are written, includes meta-tags, which are labels that are applied by "each website's own creators/owners," exactly like the ones that Mr. Gonzalez claims to have invented.  For example, the following example meta-tags, all which are taken from the HTML Specification,

are "clear unambiguous information provided by the maker to describe the nature or contents of its own product":

```
<META name="Author" lang="fr" content="Arnaud Le Hors">

<META name="date" content="1994-11-06T08:49:37+00:00">

<META http-equiv="Expires" content="Tue, 20 Aug 1996 14:25:27
GMT">

<META http-equiv="PICS-Label" content='(PICS-1.1
"http://www.gcf.org/v2.5" labels on "1994.11.05T08:15-0500" until
"1995.12.31T23:59-0000" for "http://w3.org/PICS/Overview.html"
ratings (suds 0.5 density 0 color/hue 1))'>
```

310.    asdsa

### E.    Unpatentable Subject Matter

#### 1.    The asserted claims are directed to an abstract concept of using labels on the internet

311.    In my opinion, none of the asserted claims are directed to patent eligible subject matter.  The asserted claims recite the abstract idea of using labels on the internet.

312.    A person of ordinary skill in the art would understand that the whole point of Mr. Gonzalez's patents, and the claims contained in those patents, was to use the abstract concept of labeling that was well-known in physical form to label websites.  While Mr. Gonzalez's patents were being prosecuted in the patent office, Mr. Gonzalez himself stated: "this kind of labeling is common in commerce in physical form (*e.g.* items in supermarkets), [but] it has not heretofore been used or proposed in digital form for websites."  (GONZ-00481).

313.    Mr. Gonzalez's admission to the patent office was not an isolated incident, and indeed the whole point of his alleged invention, was to apply the existing concept of "labels." Mr. Gonzalez repeatedly described his "invention" was to use labels on the internet in the same

way labels are used on potato chips, in libraries, and other physical forms, as well as digital manifestations of this type of labeling:

> The Invention proposes that, just as each bag of potato chips is labeled by its manufacturer, each website be encoded by the website creator (owner, representative, etc.) with digital labels.  These labels would unambiguously describe what each website is about, what products (if any) are sold on the sites, where the entity described in the website is located (if applicable), who created the website, and so forth.

> *(GONZ-00721).*

> [W]ebsites do not have labels, nothing that is in any way comparable to the labels on a bag of potato chips.

> *(GONZ-00721)*

> The system includes Internet-related data-gathering, labeling, storing and searching methods. The system and method can best be appreciated by metaphor: consider the Internet as a library whose books (websites) are not only scattered at random but also indistinguishable from each other except upon actually being opened. Internet portals are like librarians who are resigned to the fact that the books (websites) are in disarray, but purport to help readers by speed-reading. The present invention creates order in the library by establishing discrete sections where books (websites) can be organized by category, and by codifying information about each book (website) on index cards so that readers can more easily identify the books (websites) they need.

> *('665 patent at 2:48-67)*

> **[T]here are no hierarchical agglomerations of addresses on the Internet,** no analogue to library main sections which agglomerate books of similar subject or nature.

> *GONZ-01523 (emphasis in original)*

An Alta Vista Search for "Los Angeles plumbers" initially yielded 100% garbage under the computer-managed Websites-only search, but was salvaged with a

link to what was evidently a manually constructed "Yellow Pages" section, which had a large number of plumber listings.

Hence, while touting themselves as "high technology" enterprises with "powerful" search engines, many portals are in fact relying more and more heavily on "low tech" human intervention.

*GONZ-01524*

How does one identify and pick from a large number of similar objects?  By labeling them.

How does one make it easy to find related objects?  By storing them in an agreed location.

This is the object of the present Inventions.

*GONZ-01525*

The inventions comprise a system of Internet-related data-gathering, labeling, and Search methods.  Their significance can best be appreciated by metaphor:

…

The inventions **create order in the library** by establishing discrete sections where books can be organized by category, and by codifying information about each book on index cards so that readers can more easily identify the books they need.

*GONZ-01526 (emphasis in original)*

**Multi-parameter digital labeling of Sites could be performed manually.** Illustratively, one would scour the Internet to identify Sites that referred to wine-makers around the world.  By interviewing the owners, reading wine-books, and whatever other method, one could determine the location of each wine-maker; what kinds of wine it makes; what price range the wines are; and so forth.  All these pieces of information could be codified as sets of multi-parameter digital labels for each Site, and serve to convey unambiguous qualitative information about the Site and its owner (the winery).

*GONZ-01528 (emphasis added)*

Searches could operate solely within the library, without the need to visit Sites one by one.  This would be analogous to having library cards in a central location; the index is scanned first, before actual books are pulled from their shelves.

*GONZ-01529*

314.     As Mr. Gonzalez's repeated descriptions show, his patents were directed to a system for labeling websites that he himself analogized to the same idea that librarians and merchants have used for decades if not centuries.  As I described in § V.A and §V.D., Mr. Gonzalez was not even correct that internet websites did not use labels – eBay and Craigslist, to name just two, were well-known prior to Mr. Gonzalez's "invention" and used labels to organize classified-ad type listings on the internet so internet users could find items of interest.

315.     I understand that Mr. Gonzalez has made several arguments in an attempt to show that his "invention" is not merely an abstract labeling concept.  Primarily, it appears that Mr. Gonzalez has argued that his "invention" enables a user to run searches using any desired configuration or combination of digital labels.  (*See, e.g.*, Patent Trial and Appeal Board, Case No. CBM2015-00075, Paper No. 7 ("Patent Owner's Preliminary Response") at 1, 2, 6, 7, 37-38, 40-41, 44-46).

316.     In my opinion, a person of ordinary skill in the art would appreciate that the asserted claims are directed to an abstract idea even if Mr. Gonzalez's characterizations of his "invention" were correct (which, as I explain below, they are not).  Arbitrarily arranging labels and running searches using a configuration of such labels remains an abstract concept.  A person of ordinary skill in the art could perform the same configuration and searching using purely mental processes or a pen and paper, which shows that the idea is purely abstract.  Mental or pen-and-paper performance of the asserted claims is not only theoretical.  A person of ordinary skill in the art would appreciate that Mr. Gonzalez's own examples for describing his

"invention" – a librarian categorizing books using a card catalog, or a bag of chips being labeled – show that these tasks were actually performed both mentally and on paper (or, on card catalog library cards and bags of chips).

317.    For example, in § V.C. I described how cards containing labels for each book in a library are filed in the author catalog (alphabetically), the title catalog (alphabetically), and the subject catalog (numerically using the Dewey-Decimal system and alpha-numerically using the Library of Congress system).  Library users could search for books using any configuration of those labels – combinations of author, title, or subject could all be searched for using paper cards, i.e. *without a computer*.

318.    It would also be clear to a person of ordinary skill in the art that Mr. Gonzalez's patents require only commonplace, generic computing systems to implement the asserted claims. For example, the specification admits that the "process of creating digital labels is not dependent on any particular hardware or form of software."  (*'665 patent at 5:46-47*).  The specification also characterizes the use of databases and websites as well-known, including the use of word-search technology.  (*'665 patent at Fig. 6b, 1:53-67, 4:16-23, 12:59-61, 13:35-37, and 12:56-13:40*).

319.    Moreover, Mr. Gonzalez himself described online yellow pages as an abstract concept:

> There is hardly any prior art in this area, but [U.S. Patent No.] 5,778,367 ["Wesinger"]…implicitly depicts the invention as a "finding aid" or as an online **equivalent of a "Yellow Pages" for the Web.**
>
> - Wesinger is essentially a format-conversion system whereby non-Web compatible data can be stored on a computer system unchanged, and rendered upon demand in Web-compatible form.

- When not viewed as a format-conversion system, Wesinger's Claim #1 is in effect **an attempt to patent the abstract concepts of computer data storage and retrieval of data from computers**, or alternately to patent the concept of exchange of data over the Internet.   The conditions defined in #1 can be met by any two networked computers. The conditions of many of the subsidiary claims can be met by any Website which is hosted by a server, i.e., all Websites.

- Wesinger's **data-gathering and Search methods are not novel and are, indeed, almost universally practiced**.   Its net effect is therefore to offer to do exactly the same things that many portals and list sites already do.

*GONZ-01559 (emphasis added).*

320.    A person of ordinary skill in the art would recognize that the asserted claims are aptly characterized in the same way as Mr. Gonzalez characterized claim 1 of the Wesinger patent.  Indeed, Mr. Gonzalez's critique only highlights how his "invention" depends on well-known, commonplace functionality to support the abstract concept of "labeling" websites.

321.    Thus, a person of ordinary skill in the art would appreciate that the only elements needed to implement the abstract labeling idea are conventional hardware, capable of doing basic tasks like collecting data from the internet, storing that data in a database or repository of some kind, and searching through that data.   A person of ordinary skill in the art would have understood this without difficulty, because basic databases and programming languages like SQL enabled robust element-by-element searching (i.e., "any possible configuration") pre-date the asserted claims by decades.  (*See, e.g.*, Sequel: A Structured English Query Language, by Donald D. Chamberlin & Raymond F. Boyce, IBM Research Laboratory, San Jose, CA (1974), *available at http://www.almaden.ibm.com/cs/people/chamberlin/sequel-1974.pdf*).

322.     In my opinion, a person of ordinary skill in the art would also immediately realize that Mr. Gonzalez's arguments about his "invention" are wrong.  The asserted claims do not actually require searching using any desired combination or configuration of labels.  Instead, the asserted claims require basic steps like conducting a search, which can be based on a single label.

323.     In addition, I understand that Mr. Gonzalez has also contended that his "invention" is not abstract because the asserted claims require sourcing information from the subscriber himself.  (*Patent Owner's Preliminary Response at 43*).  A person of ordinary skill in the art would find this to be part of the same abstract labeling concept.  For example, the manufacturer of a bag of chips labels that bag of chips, just like Mr. Gonzalez told the patent office: "[the] Invention proposes that, just as each bag of potato chips is labeled by its manufacturer, each website be encoded by the website creator."  (*GONZ-00721*).

### 2.     Mr. Gonzalez's Lack Of Technical Knowledge Supports The Conclusion That His Alleged Invention Was An Abstract Idea, Not A Technological Innovation

324.     I am informed that Mr. Gonzalez had no technical background, had never created a web page, and had taken one computer programming class while attending business school in the 1970s.  I am informed that Mr. Gonzalez's relevant computer experience seems to have been as a user of Microsoft Excel as part of his banking career.

325.     Many statements made by Mr. Gonzalez to the Patent Office confirm that he was technologically naïve, more familiar with Excel than with use of databases.  For example:

> On the other hand, one could make a Microsoft Excel list of one's telephone contacts where the first column is Name, the second column is Sex, the third column year of birth, and the fourth column telephone number. (These bits of data would be provided by the first party, the respective contacts.) Each of these columns is in effect a digital label, and such a list would be digital data. It could easily be searched in a variety of ways, such as for (a) all males; (b) all persons born in 1960; (c) all males born in 1960-1970; or (d) all females with area code 202 born between 1984 and 1989.
>
> A system of multi-parameter digital labeling – such as Gonzalez proposes – would therefore greatly expand the ways by which searches could be conducted, and greatly increase the accuracy of those searches.

*GONZ-00723.*

## VI.   <u>USE OF DEMONSTRATIVES</u>

326.    I reserve the right to make demonstratives (including product demonstrations, product usage, and videos thereof), charts, graphs, or other similar visual aids for trial based upon the opinions expressed in this report, the data contained in this report, the exhibits or other things cited in this report and/or attached as exhibits to this report.


Dated: November 18, 2015

**Daniel Manheim**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via electronic mail on the date identified below.


Date: November 18, 2015                               */Nicholas Brown/*