**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **EMMANUEL C. GONZALEZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Case No. 2:14-cv-0906** |
| **vs.** | § | **Consolidated Lead Case** |
| | § | |
| **INFOSTREAM GROUP, INC.,** | § | **JURY DEMAND** |
| | § | |
| **Defendant.** | § | |

| | | |
|---|---|---|
| **NEW LIFE VENTURES, INC.** | § | **Case No. 2:14-cv-0907** |

| | | |
|---|---|---|
| **TAGGED, INC.** | § | **Case No. 2:14-cv-0993** |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ..................................................................................................... 1

II.     BACKGROUND ....................................................................................................... 2

      **A.**     The Gonzalez patents describe "digital labels" for websites. ................................. 2

      **B.**     The asserted claims describe creating digital labels for websites and using them to allow searches. ........................................................................................ 2

      **C.**     Gonzalez's infringement theory confirms that the asserted claims describe creating digital labels and using them to allow searches. ....................................... 4

      **D.**     Mr. Gonzalez had no technical experience, and did not consult anyone with technical experience in coming up with the ideas claimed in the patents. ............................................................................................................... 7

III.    THE GONZALEZ PATENTS ARE INVALID UNDER § 101 ....................................... 9

      **A.**     The asserted claims are invalid because they describe the abstract idea of applying a conventional label-based search process to Internet websites. ............. 9

              1.     Mr. Gonzalez told the Patent Office that his invention was applying an idea that was already "common in commerce in physical form" to websites. ........................................................ 10

              2.     The asserted claims are invalid because they describe applying a known, label-based search process to the Internet. .................................. 12

      **B.**     The Gonzalez patents do not describe any tangible innovation, only the use of conventional technology to implement an abstract idea. .......................... 14

      **C.**     Mr. Gonzalez's testimony shows that he didn't come up with any "inventive concept" beyond his abstract ideas ..................................................... 15

      **D.**     The asserted claims are more clearly patent-ineligible than the claims invalidated in *Ultramercial* ................................................................................ 16

      **E.**     Use of HTML forms to generate digital labels was routine and conventional prior to Mr. Gonzalez's patent application. ...................................... 18

IV.    CONCLUSION ...................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alice Corp. v. CLS Bank Int'l,*
  134 S. Ct. 2347 (2014)..............................................................................................1, 9, 14

*CyberSource Corp. v. Retail Decisions, Inc.,*
  654 F.3d 1366 (Fed. Cir. 2011).........................................................................................14

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.,*
  132 S.Ct. 1289 (2012)...........................................................................................................9

*Mortgage Grader, Inc. v. First Choice Loan Services,*
  __ F.3d. __, Case No. 2015-1415 (Fed. Cir., Jan. 20, 2016) ..................................................10

*Ultramercial, Inc. v. Hulu, LLC,*
  772 F.3d 709 (Fed. Cir. 2014)..............................................................................9, 14, 16, 17

**Statutes**

35 U.S.C. § 101 ........................................................................................................................1, 14

## I.      INTRODUCTION

The patents asserted by Mr. Gonzalez in this case are about digital labels for websites.  In describing the invention to the Patent Office, Mr. Gonzalez stated that its invention was the application to websites of an idea that was already "common in commerce in physical form": the use of labels.  Mr. Gonzalez also told the Patent Office that his invention was using digital labels for websites in the same way that physical labels are used on a bag of potato chips.  The Supreme Court established in *Alice Corp. v. CLS Bank Int'l*, that this type of invention is not patent-eligible because it is an abstract idea—unless the claims include an "inventive concept", *i.e.* an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.  134 S. Ct. 2347, 2352 (2014); 35 U.S.C. § 101.

Both the Gonzalez patents themselves, and Mr. Gonzalez's testimony, establish that the asserted claims do not include an "inventive concept" beyond the idea of using digital labels for websites.  The patents do not describe any tangible technical innovation; to the contrary, they describe using routine and conventional technology, such as database searches, to implement Mr. Gonzalez's ideas.  Mr. Gonzalez admitted that he had no technical experience other than a non-credit class he took while in business school in the 1970s, and that he did not consult with any one with technical experience in coming up with his ideas.  Mr. Gonzalez admitted that he did not invent database searches, or multi-parameter searches.  He even admitted that he did not invent digital labelling of websites—at least not single-parameter digital labelling, which was "commonplace" at the time he filed his patent application.

Summary judgment of invalidity under 35 U.S.C. § 101 should be granted.

## II.    BACKGROUND

### A.    The Gonzalez patents describe "digital labels" for websites.

Mr. Gonzalez originally asserted five related patents in this case, the '807, '339, '665, '333, and '325 patents.[1]  All five patents claim priority to a provisional application that was filed October 4, 2000, and have similar specifications.  In November, 2015, Mr. Gonzalez limited the asserted claims to claims 1-3 of the '807 patent and claims 1, 42, and 53 of the '665 patent.

The provisional application that led to the Gonzalez patents was filed on October 4, 2000.[2]  The patents explain that while search engines such as Yahoo! and Altavista were already providing Internet search, these search engines were following "the wrong path" because they were based on "word matches" or "listings-by-category."[3]  The patents assert that using "digital labels" would improve the efficacy of Internet searches over word-match or listings-by-category searches. Dkt. #109 at 3.

### B.    The asserted claims describe creating digital labels for websites and using them to allow searches.

The asserted independent claims of the '807 patent are reproduced below:

1. A host website apparatus for listing subscribers comprising:
   a computer system,
   said computer system includes a digital label database for providing to a listing subscriber digital labels representing different specific qualities and a subscriber database for storing a listing of subscribers' digital labels;
   said computer system being configured to respond to a subscriber's request for listing and guiding the subscriber via the Host Website display to enter information pertaining to the subscriber and converting the information to digital labels by accessing said digital label database and storing the subscriber's digital labels in said subscriber database; and
   said computer system further configured to enable users to search said subscriber database for subscriber digital labels identifying subscriber qualities.

3. A method for listing websites on the Internet comprising the steps of:
   configuring a computer system to compile a digital label database for providing to a listing subscriber digital labels representing different specific qualities and to compile a subscriber database for storing a listing of subscribers' digital labels;
   configuring said computer system to respond to a subscriber's request for listing; guiding the subscriber via a website display to enter information pertaining to the subscriber; and
   convening the information to digital labels by accessing said digital label database and storing subscriber digital labels in Host Website databases.

---

[1] *See* Dkt. Nos. 94-2 ('807), 94-3 ('339), 94-4 ('665), 94-5 ('333), 94-6 ('325).
[2] Ex. 1 ('807 patent) at 1:5-10; Ex. 2 ('665 patent) at 1:5-10. *See* Dkt. #109 at p3, fn3.
[3] Ex. 2 ('665 patent) at 1:53-55; 2:15-24; 7:28-29.

These claims both require a "computer system" that guides a "subscriber" to enter information, converts that information into "digital labels" from a database of possible digital labels, and then stores those labels in a "subscriber database," which contains listings of the digital labels that apply to particular subscribers.  Claim 1 further requires that the computer system enable users to search the "subscriber database" for the subscriber digital labels.

The asserted independent claim of the '665 patent is reproduced below:

1. A method for multi-parameter digital labelling of Internet Websites, comprising:

gathering of unambiguous, multi-parameter qualitative data concerning a single or a plurality of at least one of an Internet website, an Internet posting, their substantive contents, and their owner or creator;

sourcing, from the owner or creator of said website or Internet posting, each said item of qualitative data referring to said website, said internet posting, or its substantive contents or its owner or creator;

producing a plurality of digital labels for each said website or internet posting, wherein each digital label uniquely refers to and represents a particular item of qualitative information;

wherein producing of digital labels further comprises encoding of the qualitative data in any digital form;

domiciling of these multi-parameter digital labels on at least one of the same computer, the same computer network, and on several computers linked to each other;

manipulation of the said multi-parameter digital labels comprising generation of a list of at least one of websites and Internet postings that match parameters stipulated by an entity conducting a search and represented in the digital labels according to at least one of the presence of, the absence of, the numerical or other value contained in, the numerical or other value not contained in, any one, all, and any configuration of the labels that have reference to one or more websites or Internet postings; and

making available the effective use of these multi-parameter digital labels and the means for their manipulation, to the general public through the Internet.

Claim 1 of '665 patent describes a method of "multi-parameter digital labelling" of websites or internet postings, which requires gathering at least two pieces of "qualitative data" about the website/posting from its owner or creator, encoding each of those pieces of qualitative data into digital labels (which can be "any digital form" that "uniquely refers to and represents" the data), and then putting the digital labels into a database so that they can be searched by "the general public through the Internet."[4]

The Court construed the term "digital label" as meaning "something symbolic of unambiguous qualitative data about an item, its maker, or its owner, in digital form."[5]  The Court

_____

[4] Though the language of the last two claim elements is verbose, it is satisfied by generating a list of websites/postings with a label that matches a search parameter, so long as the search was made available "to the general public over the Internet."

[5] Dkt. #109 at 18.

explained that the patents make clear that a label is "symbolic of a qualitative characteristic about the subject being labeled," in contrast to word-matches, which are a "mere character-strings of unknown significance."[6]   The Court also explained that "qualitative characteristics" are qualities of a subject entity, such as height, weight, age, sales, profits, etc.[7]

The Court also construed "search" to have its ordinary meaning.[8]   In so doing, the Court rejected Gonzalez's argument that the term was limited to "dynamically filter[ing] digital labels according to configurations in the unique desires of the person directing the search."[9]

### C.    Gonzalez's infringement theory confirms that the asserted claims describe creating digital labels and using them to allow searches.

Gonzalez contends that New Life's dating website, sugardaddie.com, infringes the asserted claims because it creates digital labels about its members, and uses them to allow searches.   Gonzalez infringement expert, Dr. Garlick, provides the following "Overview" of his infringement opinion:

> The Accused Website uses the invention of the Asserted Claims by guiding a user through the signup and profile creation process during which several pieces of personal information are collected from the user and converted to digital labels. … This information is subsequently stored in a database, in the form of digital labels, and is later used to facilitate searches of the user data.[10]

Dr. Garlick goes on to provide an element-by-element explanation of his infringement opinion. For example, the chart below shows his infringement theory for claim 1 of the '807 patent.

---

[6] Dkt. #109 at 15-16.
[7] Dkt. #109 at 16-17.
[8] Dkt. #109 at 30.
[9] Dkt. #109 at 25-30.
[10] Ex. 5 (Garlick Infringement Report) at ¶ 34.

| '807 Patent, Claim 1 | Infringement Opinion[11] |
|---|---|
| 1. A host website apparatus for listing subscribers comprising: | "The sugardaddie.com web server and its associated computer systems, databases and source code are a host website apparatus listing subscribers." <br> ¶ 38. |
| a computer system, | "The Accused Website uses a computer system that includes a web server and MySQL database server." <br> ¶ 40. |
| said computer system includes a digital label database for providing to a listing subscriber digital labels representing different specific qualities and a subscriber database for storing a listing of subscribers' digital labels; | "The accused publicly available NLV website <u>uses database tables to store subscriber digital labels</u> representing different specific qualities <u>such as body type and yearly income</u>." <br> ¶ 45 *(citations omitted; emphasis added).* |
| said computer system being configured to respond to a subscriber's request for listing and guiding the subscriber via the Host Website display to enter information pertaining to the subscriber and | "The accused NLV website guides the subscriber through a multiple-step signup process. This example begins on the homepage, where a user is asked their gender, email address, and desired login information. Once this information has been submitted, the user is taken to another page with a form where more detailed information is collected, including … body type, and … annual income." <br> ¶ 49 *(citations omitted).* |
| converting the information to digital labels by accessing said digital label database and storing the subscriber's digital labels in said subscriber database; and | "This data is then sent to the 'SignUpController' PHP code where, for example, the 'bodytype' parameter is encoded, and subsequently stored in a MySQL Table." <br> ¶ 50 *(citations omitted).* <br><br> The source code cited regarding the MySQL table shows that 'bodytype' and 'yearlyincome" are both stored as integers. <br> *See* p.29 (lines 2525 and 2520). |
| said computer system further configured to enable users to search said subscriber database for subscriber digital labels identifying subscriber qualities. | "The accused NLV website implements a form enabling users to search the database for particular subscriber qualities among the dating profiles." <br> ¶ 54. |

---

[11] All citations in this column are to Ex. 5 (Garlick Infringement Report).

As shown in the claim chart, Dr. Garlick's opinion is that New Life uses the claimed digital labels because (1) its website prompts users to fill out HTML forms with information about themselves, such as 'body type' and 'yearly income,' (2) it uses a database to store values representing this information, *i.e.* it stores integers representing 'body type' and 'yearly income', and (3) it allows users to search the database.  The portions of the HMTL forms that are used in New Life's website for entering 'body type' and 'yearly income' are shown below, with the drop-down menu shown in a browser on the left, and the HTML text on the right.[12]

| Browser | HTML |
|---|---|
| **BodyType**<br>✓ Select<br>Slim<br>Athletic<br>Average<br>Muscular<br>A few extra pounds<br>Curvy<br>Overweight | `<li>`<br>`<label for="bodytype">BodyType</label>`<br>`<select name="bodytype" id="bodytype"`<br>`class="select_ui">`<br>`<option value="">Select</option>`<br>`<option value="7">Slim</option>`<br>`<option value="2">Athletic</option>`<br>`<option value="3">Average</option>`<br>`<option value="5">Muscular</option>`<br>`<option value="1">A few extra pounds</option>`<br>`<option value="4">Curvy</option>`<br>`<option value="6">Overweight</option>`<br>`</select>`<br>`</li>` |
| **Yearly Income**<br>✓ Select<br>Less than 100,000<br>100,000 - 500,000<br>500,000 - 1,000,000<br>1,000,000 - 5,000,000<br>5,000,000 - 10,000,000<br>10,000,000 Or More<br>NEXT | `<li>`<br>`<label for="yearlyincome">Yearly Income</label>`<br>`<select name="yearlyincome" id="yearlyincome"`<br>`class="select_ui">`<br>`<option value="">Select</option>`<br>`<option value="1">Less than 100,000</option>`<br>`<option value="2">100,000 - 500,000</option>`<br>`<option value="3">500,000 - 1,000,000</option>`<br>`<option value="4">1,000,000 - 5,000,000</option>`<br>`<option value="5">5,000,000 - 10,000,000</option>`<br>`<option value="6">10,000,000 Or More</option>`<br>`</select>`<br>`</li>`[13] |

---

[12] These HTML forms are cited to in Dr. Garlick's report, and the 'body type' form is physically reproduced on p.40. Ex. 5 at ¶ 60 (image of 'body type' form); ¶¶ 40, 81.

[13] *See* Ex. 5 at p.51, lines 101-109.

The HTML text shows how the subscriber's selection of a particular 'body type' or 'yearly income' is represented by an integer.   For example, the 'body type' selection 'Slim' is represented by 7, and 'Athletic' is represented by 2.   Similarly, the 'yearly income' of 'Less than 100,000) is represented by 1.   According to Mr. Gonzalez, these are examples of digital labels that infringe his patents.

> **D.   Mr. Gonzalez had no technical experience, and did not consult anyone with technical experience in coming up with the ideas claimed in the patents.**

Mr. Gonzalez is the sole named inventor.   Mr. Gonzalez has no technical experience— except that between 1971 and 1974, while he was in business school, he took a non-credit class on computer programming.[14]  That was more than 25 years before he prepared and filed the patent application on his idea for improving Internet searches.

Mr. Gonzalez attached a page of HTML code to his patent application, but he got that code from someone else.[15]   When asked about it as his deposition, he testified as follows:

> Q. And there's HTML code there. Do you recognize that HTML code?
> A. Well, it's complicated. I'm not sure I recognize it, but yeah.
> Q. But you do recognize it as HTML code?
> A. Well, it looks like it.[16]

Though Mr. Gonzalez testified that he understood generally that HMTL was "a protocol for how to display websites," he did not understand what an HTML tag was.[17]  This shows his lack of technical understanding, because tags are the basic building-blocks of HMTL; they are what separates an HTML file from an ordinary text file.[18]  Similarly, Mr. Gonzalez did not know what

---

[14] Ex. 4 (Gonzalez Depo.) at 40:4-41:3; 9:5-9 (finished Columbia Business School in 1974).

[15] Ex. 4 at 58:16-22; Ex. 3 (Provisional Application) at p.55.  This HMTL describes a portion of the header-bar of a website called AtoZPhillipines.net.

[16] Ex. 4 at 57:15-20.

[17] Ex. 4 at 146:4-11 (HMTL); 137:7-14 (HTML tag).

[18] Ex. 6 (HTML FOR DUMMIES (1995)) at 67.

the HMTL specification was.[19]

Furthermore, though his patents specifically claim the use of databases, and database searches, Mr. Gonzalez did not have any technical understanding of databases.  Mr. Gonzalez did not know what "SQL" was and had not heard that term used, even though SQL is the language used to search and modify data in all major databases, and had been known since at least 1974.[20] Nor did Mr. Gonzalez understand what a "database table" was.[21]

Mr. Gonzalez came up with the ideas that led to the asserted patents while overseeing the construction of a hotel in the Phillipines.[22] He hired someone to create a website for the hotel, but when he searched on the internet, he could not locate the website.[23]  He concluded that "this was a deficient system," and that digital labels were the solution:

> Q.  So if I understand what you're saying, the idea that you had was that instead of using either a category tree or alphanumeric raw string matching essentially, you would have website owners label, digitally label their own websites?
>
> A. Using a convention that was promulgated or agreed somehow by the search engine. A website owner couldn't just put data on his site and hope that people would understand what that data meant in -- in a certain -- in a sure way. So you -- it's like Morse code. I mean, somebody has to agree that, you know, so many dots and dashes mean this letter and you can't just put out dots and dashes and hope that the rest of the world will understand what you're saying unless you know what is the code.[24]

Mr. Gonzalez did not talk to anyone with any technical experience in coming up with these ideas, because he felt he understood "the concepts that can be employed in computer

---

[19] Ex. 4 at 146:20-147:4.

[20] Ex. 4 at 43:8-44:6; Ex. 7 (MySQL/PHP Database Applications (2001)) at NLV-000747 ("All of the major databases make use of the Structured Query Language (SQL)"; Ex. 8 (1974 Sequel article).

[21] Ex. 4 at 120:24-121:5.

[22] Ex. 4 at 15:18-23.

[23] Ex. 4 at 18:8-12; 19:14-19.

[24] Ex. 4 at 28:25-29:18; *see also* 24:20-28:1.

programming."[25] Mr. Gonzalez drafted his patent application himself,[26] and he in doing so, came up with examples of digital labels based on his "general knowledge," because he "didn't get any actual data."[27]

## III.    THE GONZALEZ PATENTS ARE INVALID UNDER § 101

In *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S.Ct. 1289 (2012), the Supreme Court set out a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014).  First, courts must determine if the claims at issue are directed to a patent-ineligible concept.  *See id.*  If not, the inquiry ends, as the claims are patent-eligible.  But if so, the next step is to look for an "inventive concept"—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the abstract idea itself. *Id.*

### A.    The asserted claims are invalid because they describe the abstract idea of applying a conventional label-based search process to Internet websites.

The Gonzalez patents are invalid because they claim the abstract idea of using labels to facilitate searches.  While the claims require use of a computer, a database, and the Internet, this is not enough to make them patent-eligible.  In *Alice*, the Supreme Court emphasized that implementing an abstract idea on a computer does not make that idea patentable.  134 S. Ct. at 2352.  The Supreme Court explained that an abstract idea cannot be transformed into a patentable invention by "appending conventional steps, specified at a high level of a generality." *Id.* at 2357 (*quoting Mayo*, 132 S.Ct. at 1300).  For the same reason, "use of the Internet does not transform an otherwise abstract idea into patent-eligible subject matter."  *Ultramercial, Inc. v.*

---

[25] Ex. 4 at 39:8-24; 49:11-23.
[26] Ex. 4 at 55:10-56:1.
[27] Ex. 4 at 45:19-46:7.

*Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014).   Similarly, use of a database is not something that can make an abstract idea patent-eligible.   *Mortgage Grader, Inc. v. First Choice Loan Services*, __ F.3d. __, Case No. 2015-1415 (Fed. Cir., Jan. 20, 2016) ("generic computer components such as an 'interface,' 'network,' and 'database' … do not satisfy the inventive concept requirement").

1.   <u>Mr. Gonzalez told the Patent Office that his invention was applying an idea that was already "common in commerce in physical form" to websites.</u>

In describing the invention to the Patent Office, Gonzalez explained that its invention was the application to websites of an idea that was already "common in commerce in physical form": the use of labels.   Specifically, Gonzalez stated:

> The examiner's argument is akin to observing that any item in a warehouse can be labeled, after someone has opened the boxes one by one and evaluated what's in them; this is indeed obvious, but it is not what Applicant is claiming.   What Applicant proposes is a labeling system based on information provided by those who packed the boxes and which will allow anyone to know precisely what the contents of the boxes are, without having to open and evaluate them one by one. <u>While this kind of labeling is common in commerce in physical form (e.g., items in supermarkets), it has not heretofore been used or proposed in digital form for websites.</u>[28]

Gonzalez's statement to the Patent Office that he was proposing a "labeling system" that was "common in physical form" was not an isolated occurrence.   Gonzalez went on to tell the Patent Office that his "Invention" was using "digital labels" for websites in the same way that labels are used in supermarkets to describe a package, such as a bag of potato chips.   Gonzalez pointed out how there are multiple labels on a bag of potato chips, *e.g.* a brand label stating that the chips are made by "Frito-Lay", an ingredients label with a list of ingredients, and a weight label stating that the package has "Net Weight 16 oz."   Gonzalez then explained:

---

[28] Exh. 9 (File History) at GONZ-00481.

> The Invention proposes that, just as each bag of potato chips is labeled by its manufacturer, each website be encoded by the website creator (owner, representative, etc.) with digital labels. These labels would unambiguously describe what each website is about, what products (if any) are sold on the sites, where the entity described in the website is located (if applicable), who created the website, and so forth.[29]

This shows that Gonzalez told the Patent Office that his invention was to label websites using a digital form of the labels that were already well-known on physical items, such as potato-chip bags.  Reiterating this point, Gonzalez stated: "websites do not have labels, nothing that is in any way comparable to the labels on a bag of potato chips."[30]

In the specification, the Gonzalez patents provide a similar description, explaining that the invention allows labeling of websites in the same way that a card-catalog allows labeling the books in a library:

### SUMMARY OF THE INVENTION

> There is provided a Host Website system and method in which subscribers label their own products and services and in which similarly labelled objects and services are stored in common locations with hierarchical multi-parameter labels.

> The system includes Internet-related data-gathering, labelling, storing and searching methods.  The system and method can best be appreciated by metaphor: consider the Internet as a library whose books (websites) are not only scattered at random but also indistinguishable from each other except upon actually being opened.  Internet portals are like librarians who are resigned to the fact that the books (websites) are in disarray, but purport to help readers by speed-reading. The present invention creates order in the library by establishing discrete sections where books (websites) can be organized by category, and by codifying information about each book (website) on index cards so that readers can more easily identify the books (websites) they need.

This shows that the invention described in the Gonzalez patents is the abstract idea of using of labels as a way to organize websites by category to make them easier to find, because it shows that it is the same idea that is used in library-card catalogs: using labels to organize books by category so they are easier to find.

---

[29] Exh. 10 (Applicant Letter to Examiner) at GONZ-00721.
[30] *Id.*

2.      The asserted claims are invalid because they describe applying a known, label-based search process to the Internet.

Consistent with what Mr. Gonzalez told the Patent Office, and what the specification explains, the asserted claims describe the idea of label-based search, applied to Internet websites. For example, the claim chart below shows how claim 1 of the '665 patent differs from a library-card search only because it is applied to "Internet Websites" instead of books, and uses "digital labels" instead of "printed labels".

| '665 Patent, Claim 1 | Library-Card Search |
|---|---|
| 1. A method for multi-parameter (digital) <u>printed</u> labelling of (Internet Websites) <u>books</u>, comprising: | Library cards contain printed labels for books.  |
| gathering of unambiguous, multi-parameter qualitative data concerning a single or a plurality of at least one of (an Internet website, an Internet posting) <u>a book</u>, their substantive contents, and their owner or creator; | The labels in library cards reflect unambiguous multi-parameter qualitative data about the book, *e.g.* title, author, subject, Library of Congress number. |
| sourcing, from the owner or creator of said (website or Internet posting) <u>book</u>, each said item of qualitative data referring to said (website, said internet posting) <u>book</u>, or its substantive contents or its owner or creator; | The data printed as labels on a library card is 'sourced' from the book's owner (the library).<br><br>Alternatively, this data is 'sourced' from the book's creator (the publisher), which prints the title, author, and Library of Congress number in the book.[31] |

---

[31] The ultimate source of the book's title and author name was the book's author, which may also be considered its creator.

| | |
|---|---|
| producing a plurality of (digital) <u>printed</u> labels for each said (website or internet posting) <u>book</u>, wherein each (digital) <u>printed</u> label uniquely refers to and represents a particular item of qualitative information;<br><br>wherein producing of (digital) <u>printed</u> labels further comprises encoding of the qualitative data in any (digital) <u>printed</u> form; | Library cards contain printed labels, each of which uniquely refers to and represents a particular item of qualitative information (*e.g.* title, author, subject, Library of Congress number), and is encoded in printed form on the library card:<br><br> |
| domiciling of these multi-parameter (digital) <u>printed</u> labels (on at least one of the same computer, the same computer network, and on several computers linked to each other) <u>in a card catalog</u>; | Printed labels on library cards were put in card catalogs: |
| manipulation of the said multi-parameter (digital) <u>printed</u> labels comprising generation of a list of at least one of (websites and Internet postings) <u>books</u> that match parameters stipulated by an entity conducting a search and represented in the digital labels according to at least one of the presence of, the absence of, the numerical or other value contained in, the numerical or other value not contained in, any one, all, and any configuration of the labels that have reference to one or more (websites or Internet postings) <u>books</u>; and | Labels on library cards could be used to generate of list of books that match search parameters, according to the presence of a value contained in a label, *e.g.* author = Savage, Ernest Albert.<br><br> |

13

| making available the effective use of these multi-parameter (digital) <u>printed</u> labels and the means for their manipulation, to the general public through the (Internet) <u>card catalog</u>. | Labels on library cards, and the ability to search them, were available to the general public through a library's card catalog. |
|---|---|

This claim chart shows why the asserted claims are invalid under 35 U.S.C. § 101: they claim the abstract idea of using labels to facilitate searches, applied to websites instead of books, and implemented using a computer and the Internet instead of with pen and paper.  Neither the use of a computer and the Internet, nor the application to websites instead of books, is enough to add the required "inventive concept."  *See Alice*, 134 S. Ct. at 2352; *Ultramercial,* 772 F.3d at 716. The idea of using labels to facilitate searches was performed using pen-and-paper for centuries before Gonzalez's patent application, which further shows that the claims are not patent-eligible.[32]

### B.     The Gonzalez patents do not describe any tangible innovation, only the use of conventional technology to implement an abstract idea.

The common specification of the Gonzalez patents shows that they do not describe any tangible innovation, because it describes implementing the abstract idea of using digital labels for websites using routine and conventional technology.  For example, the specification states: "The automatic process of creating digital labels is not dependent on any particular hardware or form of software."[33]  Similarly, the specification explains how a search for digital labels is performed as follows:

---

[32] *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011) ("a software implementation of a purely mental process that could otherwise be performed without the use of a computer" is not patent-eligible, nor is "[t]he mere manipulation or reorganization of data"); *see also id.* at 1373 ("computational methods which can be performed entirely in the human mind are the types of methods that embody the 'basic tools of scientific and technological work' that are free to all men and reserved exclusively to none").
[33] Ex. 2 at 5:46-47.

14

> At any later time, any subscriber could be searched for through the Host Website on the basis of any configuration of digital labels, e.g., state-sponsored universities in California which offer minority-eligible scholarships. <u>To perform this search, a Host Website computer would scan its database for listings which have the "mnsch" label as well as the particular labels for the other characteristics</u> of being a school, more precisely a university, state-sponsored, in California.

Nothing resembling technical innovation is described here.  All the specification says is that a search is performed by a computer scanning a database for particular values.  That, of course, was well-known for decades prior to the filing date of the Gonzalez patents.[34]

### C.   Mr. Gonzalez's testimony shows that he didn't come up with any "inventive concept" beyond his abstract ideas.

Mr. Gonzalez's testimony establishes that the asserted claims do not include an "inventive concept" beyond his abstract idea of using digital labels for websites.  Mr. Gonzalez admitted that he did not invent a new type of database, and that his invention did not require any particular type of database.[35]  Mr. Gonzalez also admitted that he did not invent multi-parameter searching:

> Q. So you don't think you invented the idea of a two-parameter search generally,
>
> -- A. No.
>
> Q. -- correct?
>
> A No.
>
> Q. What you believe you invented is the use of multi-parameter digital labeling of websites for searching on the internet, correct?
>
> A. Where the information used to create the multi-parameter digital labels was elicited from the owner or creator of the website using an automated interface on the internet.
>
> Q. Understood. But <u>the part where a computer performs a search through a database for two or three or four parameters</u>, that's not something you invented, correct?
>
> A. <u>I did not invent that.</u>[36]

---

[34] *See, e.g.* Ex. 8 (1974 Sequel article).
[35] Ex. 4 at 121:7-9; 115:7-9
[36] Ex. 4 at 170:1-21 (emphasis added).

Furthermore, Mr. Gonzalez admitted that *single*-parameter digital labeling was "commonplace" at the time of his patent application, and not something that he invented:

> Q. And at the time that you filed this provisional application in the fall of 2000, you believed that single-parameter labeling of websites, <u>single-parameter digital labeling of websites was commonplace, correct</u>?
>
> A. <u>Yes.</u>
>
> Q. You didn't think you had invented single-parameter labeling of websites?
>
> A. No. May I add?
>
> Q. Please.
>
> A. But Yahoo! fails not just because of the difference between single and multi-parameters. It also fails to anticipate my invention because the data was not obtained directly from the owners of the websites. The data was judged by employees of Yahoo! who had read the website.
>
> Q. <u>Do you think that you invented something about single-parameter digital labeling or not?</u>
>
> A. <u>Certainly not.</u>[37]

Mr. Gonzalez's testimony shows that what he says he invented was an abstract idea. Databases and multi-parameter searching were known, and not something he invented. Single-parameter digital labeling of websites was commonplace, and not something he invented. What Mr. Gonzalez says he invented is the idea of applying the admittedly-known technique of multi-parameter search to the context of Internet websites, using admittedly-known digital labels. That idea is abstract and not patent-eligible.

**D.    The asserted claims are more clearly patent-ineligible than the claims invalidated in *Ultramercial*.**

In *Ultramercial, Inc. v. Hulu*, the Federal Circuit found that claims directed to "distributing copyrighted media products over the Internet where the consumer receives a copyrighted media product at no cost in exchange for viewing an advertisement" were not patentable--despite the fact that they claims included numerous additional elements. 772 F.3d at

---

[37] Ex. 4 at 167:24-168:21 (emphasis added).

712, 715-16.

First, the court found that the ordered combination of steps was an abstraction, as it was no more than "an idea, having no particular concrete or tangible form." *Id.* at 715. Specifically:

> The process of receiving copyrighted media, selecting an ad, offering the media in exchange for watching the selected ad, displaying the ad, allowing the consumer access to the media, and receiving payment from the sponsor of the ad all describe an abstract idea.

*Id.* The claim that was found to be abstract idea in *Ultramercial* is indistinguishable in any material respect from the claims at issue here. Claim 1 of the '665 patent, for example, claims gathering information about a website from the owner of a website, assigning labels to the information, and allowing a user to search the label-information pairs. This is merely the categorization of third-party information in a format that allows someone to later search for that information.

Nothing in the asserted claims details how, technologically, "labels" are to be created, used, stored, or manipulated other than at the most generic and conventional level, *e.g.* 'use a database.' As the inventor recognized while applying for his patent, this sort of "label" had long been used to identify and categorize goods in the analog word. Taking the same concept into the digital world and saying "apply it" is not patentable.

The additional elements in patents-in-suit, like the additional elements in the claims at issue in *Ultramercial*, add nothing that would make the abstract idea patentable. In *Ultramercial*, the claims included such elements as "accessing an activity log" and "recording a transaction event to the activity log." Yet the court found that these elements were merely "routine, conventional activity....specified at a high level of generality." Many of the additional elements were insignificant "data gathering" steps—"nothing of practical significance to the underlying abstract idea." *Id.* at 716.

The same is true here.  For example, claim 1 of the '665 patent includes elements such as "manipulation of ... digital labels" to generate a list of websites that include matching values for values searched for by a user and "domiciling...digital labels on [a computer]." That is, accessing the digital label log and recording labels in the digital label log. These are nothing more than the "routine, conventional activity" that would be undertaken in digitizing and searching a card catalog.

Similarly, claim 1 and 3 of the '807 patent describe an apparatus and method that asks users to label their products with particular categories of labels and then allows other users to search a database of those labels.  The fact that the apparatus includes a "computer system" and a "database" is irrelevant: those elements are nothing more than routine, conventional elements that merely implement the abstract idea.  These elements are claimed at the highest level of generality, as shown by the fact that the Gonzalez patents rely on the common knowledge of those in the art to carry out the actual implementation of the claim.

> **E.** **Use of HTML forms to generate digital labels was routine and conventional prior to Mr. Gonzalez's patent application.**

To the extent Mr. Gonzalez argues that an "inventive concept" is provided by some aspect of his disclosure of using a website to gather data from a user and convert that data into "digital labels" that can be searched in a database, that argument should be rejected.  By the time of the Gonzalez patent application, it was routine and conventional to use HTML forms to gather data about a user, and then convert that data into digital labels that were stored in a database so they could be searched.

For example, eBay was a public company by the end of 1998, more than two years before the Gonzalez patent application.  The eBay website used a database in combination with HTML forms to gather data about auction listings, and then converted that data into digital labels that

were stored in a database.[38]   Portions of the HMTL forms that were used in the prior-art eBay website for entering the 'category' and 'region' to be searched are shown below, with the browser's drop-down menu on the left, and the underlying HTML on the right.

| Browser[39] | HTML[40] |
|---|---|
| Category<br>Price Range<br>Regions<br>Order by<br>View Results<br><br>✓ All Categories<br>Antiques<br>Books, Movies, Music<br>Coins & Stamps<br>Collectibles<br>Computers<br>Dolls, Figures<br>Jewelry, Gemstones<br>Photo & Electronics<br>Pottery & Glass<br>Sports Memorabilia<br>Toys, Bean Bag Plush<br>Miscellaneous<br>Text only results | \<select name="category0"\><br>  \<option value=""\>All Categories\</option\><br>  \<option value="353"\>Antiques\</option\> \<option value="266"\>Books, Movies, Music\</option\><br>  \<option value="866"\>Coins & Stamps\</option\><br>  \<option value="1"\>Collectibles\</option\><br>  \<option value="160"\>Computers\</option\><br>  \<option value="237"\>Dolls, Figures\</option\><br>  \<option value="281"\>Jewelry, Gemstones\</option\><br>  \<option value="1047"\>Photo & Electronics\</option\><br>  \<option value="870"\>Pottery & Glass\</option\><br>  \<option value="888"\>Sports Memorabilia\</option\><br>  \<option value="220"\>Toys, Bean Bag Plush\</option\><br>  \<option value="99"\>Miscellaneous\</option\><br>\</select\> |
| Regions<br>Order by<br>View Results<br><br>✓ All of eBay<br>AZ--Phoenix<br>CA--Los Angeles<br>CA--Sacramento<br>CA--San Diego<br>CA--San Francisco<br>CO--Denver<br>CT--Hartford<br>DC--Baltimore-Washington<br>FL--Jacksonville | \<select NAME="ebaytag1code" SIZE="1"\><br>\<option VALUE="0" selected\>All of eBay\</option\><br>\<OPTION VALUE="39"\>AZ--Phoenix<br>\<OPTION VALUE="1"\>CA--Los Angeles<br>\<OPTION VALUE="45"\>CA--Sacramento<br>\<OPTION VALUE="48"\>CA--San Diego<br>\<OPTION VALUE="49"\>CA--San Francisco<br>\<OPTION VALUE="16"\>CO--Denver<br>\<OPTION VALUE="20"\>CT--Hartford<br>\<OPTION VALUE="4"\>DC--Baltimore-Washington<br>\<OPTION VALUE="24"\>FL--Jacksonville<br>...<br>\</select\> |

As can be seen, the HTML form used by the prior-art eBay website represented a user's selection

---

[38] Ex. 11 (1998 eBay Annual Report) at 8 ("A seller registered with eBay can list a product for auction by completing a short online form"); 12 ("The Company's system consists of Sun database servers running Oracle relational database management systems");  8 ("Bidders also can search specific categories or the entire database of auction listings").

[39]  The images in this column are from Ex. 12 (NLV-001736, https://web.archive.org/web/ 19991012111950/http://pages.ebay.com/search/items/search.html).

[40] The text in this column is from Ex. 13 at NLV01743-44.

in the fields 'category' and 'region' with an integer. For example, the 'category' selection 'Antiques' is represented by 353, and 'Books, Movies, Music' is represented by 266.  Similarly, the 'region' of 'AZ--Phoenix' is represented by 39, and the 'region' of 'CA--Los Angeles' is represented by 1.

This demonstrates that it was routine and conventional to use HTML forms to gather data from a user, and then convert that data into digital labels that could be used to search a database. Thus, any argument by Gonzalez that an "inventive concept" is provided by some aspect using a website to gather data from a user and convert that data into "digital labels" should be rejected.

## IV.    CONCLUSION

For the reasons stated herein, summary judgment of invalidity should be granted.

Dated: January 27, 2016                                Respectfully Submitted,

By:      */s/ Nicholas A. Brown*
NICHOLAS A. BROWN
(CA SBN 198210, admitted EDTX)
brown@gtlaw.com
STEPHEN M. ULLMER
(CA SBN 277537, admitted EDTX)
ullmers@gtlaw.com
GREENBERG TRAURIG, LLP
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111-5983
Telephone: 415.655.1300
Facsimile: 415.520.5609

**ATTORNEYS FOR DEFENDANTS
TAGGED, INC. AND NEW LIFE
VENTURES, INC**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the date listed below, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3).  Any other counsel of record will be served by a facsimile transmission and/or first class mail.

Dated: January 27, 2016                 _/s/ Nicholas A. Brown_____

                                             Nicholas A. Brown

21